[No. D002281. Fourth Dist., Div. One. Nov. 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID MICHAEL DINGLE, Defendant and Appellant.

**COUNSEL**

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jesus Rodriguez, Robert M. Foster and Deborah D. Factor, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WORK, J.**—David Michael Dingle appeals a judgment convicting him of first degree murder (Pen. Code,[1] § 187), rape (§ 261, subd. (2)), sodomy (§ 286, subd. (c)), arson (§ 451, subd. (b)), first degree burglary with intent to commit theft (§ 459), and first degree burglary with intent to rape (§ 459). Dingle, a black male charged with killing a white person, primarily contends his right to trial by a jury chosen from a representative cross-section of the community under article I, section 16, of the California Constitution was violated by the trial court's failure to order the prosecution to explain the reasons for which two black jurors were peremptorily challenged, and his confession was illegally obtained. Because we hold the court erred in admitting the confession, it is unnecessary to address the jury challenge issue, and we reverse the judgment for that error.

For purposes of guiding the trial court on retrial, we decide other issues raised: whether his conviction of burglary with intent to commit a theft was improper because (1) the unauthorized making of a long distance telephone call is not theft, and (2) if theft, the jury instructions omitted the element of intent to permanently deprive the victim of possession.[2]

### I

### DINGLE'S CONFESSION IS NOT ADMISSIBLE

Dingle confessed twice. The first confession, extracted after he had invoked his right to counsel, was found to be in violation of his right to counsel and therefore inadmissible. Dingle's motion to exclude the second confession because it was tainted by the illegally obtained confession, was denied.

*Facts*

Dingle was arrested in Chicago on February 1, 1984, and taken by airplane to the San Diego Police Department by two police officers, Dreis and Ybarrondo. On the airplane, the officers advised him of his *Miranda*[3] rights, and Dingle agreed to talk. At the San Diego police station, the officers placed him in an office, reminded him of his rights, and asked if he was still willing to answer questions. Dingle said: "Yes. Go ahead and ask

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] We do not address Dingle's contentions that he was improperly sentenced.

[3] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

questions." Officer Ybarrondo questioned him from 5:40 p.m. to 7:05 p.m. about another crime, and Officer Dreis questioned him until about 8:10 p.m. about the crime involved in the present case. Dingle gave his version of the events at the time of the victim's death, denying guilt. Officer Dreis said he knew Dingle had committed certain acts against the victim, he needed to know exactly what happened, and if Dingle intended to kill the victim he should probably say nothing. Dingle said "I think now that you told me what you think, I better talk to a lawyer." Dreis and Ybarrondo ceased the interrogation and left the room.

Dreis informed Sergeant Kennedy, in charge of the investigation, of Dingle's denials and request for an attorney. Kennedy immediately confronted Dingle, saying he was aware Dingle had asked for an attorney, but he just wanted Dingle to sit there and listen to him. Sergeant Kennedy stated he knew Dingle had exercised his right not to speak further about the murder, and that he had requested to confer with a lawyer before further communication. In spite of this awareness, Kennedy, a veteran law enforcement officer, deliberately, immediately approached Dingle in the interrogation room for the purpose of getting his statement about the crime. Kennedy said he believed the law permitted him to continue questioning Dingle in violation of his Fifth Amendment rights, for as long as Kennedy felt necessary, even though the statements elicited could not be used against Dingle.

Kennedy told Dingle he believed he had raped the victim and set her apartment on fire because there was evidence Dingle had made a telephone call from the victim's apartment to his mother; Dingle's friends said he left his apartment twice in contradiction to Dingle's statement that he had not left at all; and he was aware Dingle had sexual problems because he was on probation for a sex crime. Kennedy said he did not understand why Dingle was going to put his mother through an ordeal by making her testify against him.

Dingle began to cry, said he had a problem and needed help, and asked to call his father. Dingle spoke to his father, and then asked Kennedy if there was any way he could get some help. Kennedy said he could get help through the court and penal systems, but first he had to stop lying. Dingle, still crying, asked what was going to happen to him tonight. Kennedy asked why he wished to know this at that time, and Dingle said he was afraid he might do something to himself. Kennedy said Dingle was going to jail because he was brought back on a warrant, and that the jail personnel would be notified of Dingle's fear. Kennedy said he would tell Dingle's probation officer he was in town.

Dingle, still crying, said he wanted to talk about the bad things he had done, and confessed.[4]

At some point during the interrogation, Dingle was supplied with aspirin and a coke. After the confession, Kennedy asked Dingle if he would submit to a psychiatric examination at the district attorney's office, and Dingle agreed. Dingle was booked into the county jail.[5]

The second confession occurred February 3 at the jail. Dingle filled out an inmate request form on February 2, asking to speak to Sergeant Kennedy. Responding, Kennedy asked what he could do for Dingle. Dingle replied, "I want to know how much time that I would get for killing the lady if I pled guilty." Kennedy said the sentence was up to the courts, but he would like to ask him some more questions about the murder if Dingle was willing. Dingle replied, "go ahead." Kennedy read Dingle his *Miranda* rights, asked him if he understood each and if he was willing to talk. Dingle replied "yes." Kennedy asked questions about the crime, and Dingle answered, essentially repeating and expounding upon the details given in the first confession.

The trial court found Dingle had the right to call the police if he desired, and it was proper for Kennedy to respond; that the statements made by Dingle on February 3 before he was read his *Miranda* rights were not the product of an inquiry by Sergeant Kennedy; and that thereafter Dingle made his statements freely and voluntarily.

*Legal Analysis*

■  The use of an involuntary confession in a criminal prosecution is a denial of due process under both the federal and state Constitutions. Further, when, as here, the statements are taken after an accused has specifically invoked the right to counsel, the prosecution bears a "particularly onerous" burden to show Dingle knowingly and intelligently waived the right against self-incrimination and to counsel, a showing usually made *only* when a defendant *unreservedly initiates* the later interrogation. (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 702 [159 Cal.Rptr. 684, 602 P.2d 384].)

---

[4]In his first confession, Dingle stated that he entered the victim's apartment by slipping the front door lock with a screwdriver, looked around and thought to himself, "What am I doing here," and then made a phone call to his mother. He left and reentered the apartment a second time, and sat there. He left and reentered the apartment a third time, after he noticed the victim had entered. He raped and sodomized her, and she slumped down with her head in the water in the bathroom. He left the apartment and returned later and started a fire.

[5]Dingle's statement to Dreis, while being processed immediately after the confession, that he was sorry for having lied during the first part of the interrogation, clearly flowed directly from Kennedy's unlawful tactics, and may not be used at retrial.

It is the reviewing court's duty to examine the uncontradicted facts to determine independently whether the trial court properly concluded that a confession was voluntary. The burden is on the prosecution to show voluntariness.[6] When presented with conflicting testimony, we do not reweigh it on appeal, and thus we accept the version of events most favorable to the People, to the extent it is supported by the record. (*People v. Jimenez* (1978) 21 Cal.3d 595, 602, 609 [147 Cal.Rptr. 172, 580 P.2d 672], and cases cited therein; *People v. Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866].)

The totality of the circumstances must be examined to determine whether the confession was the product of a rational intellect and a free will. (*People v. Haydel, supra,* 12 Cal.3d 190, 198.) When an illegally obtained confession is followed by a subsequent confession, it is presumed the second confession is the product of the same improper police conduct which induced the first confession, absent a showing by the prosecution of a break in the causative chain between the two confessions. (*People v. Braeseke, supra,* 25 Cal.3d 691, 703-704; vacated and remanded 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147]; reiterated 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149]; cert. den. 451 U.S. 1021 [69 L.Ed.2d 395, 101 S.Ct. 3015]; *People v. Jimenez, supra,* 21 Cal.3d 595, 614.)[7] Factors to consider include

---

[6]There is a question as to whether the standard for the burden of proof for voluntariness of confessions is controlled by the federal standard ("preponderance of evidence," *Lego v. Twomey* (1972) 404 U.S. 477 [30 L.Ed.2d 618, 92 S.Ct. 619]), or by the California standard ("beyond a reasonable doubt," *People v. Jimenez, supra,* 21 Cal.3d 595, 608). The Third District decided in *In re Randy H.*\* (Cal.App.) that under California Constitution, article I, section 28, subdivision (d), the federal standard applied. On May 2, 1985, the California Supreme Court retransferred the case to the Third District for reconsideration in light of *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789], wherein the court held that the exception to section 28, subdivision (d) covers Evidence Code section 940, which includes "judicial decisions relating to the privilege against self-incrimination." (*Id.,* at p. 808.) *Ramona R.* involved a juvenile's "use immunity" privilege, and presumably the same analysis applies to the issue of voluntariness of confessions, since both derive from the privilege against self-incrimination. Thus, the California standard controls.

\*Reporter's Note: Hearing granted May 17, 1984 (Crim. 23717).

[7]The United States Supreme Court recently analyzed the issue of subsequent admissions in *Oregon v. Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285], holding that an admission not preceded by *Miranda* warnings, but which is otherwise voluntary, is *not* presumed to taint a second admission. In contrast, if the first admission results from a Fourth Amendment search and seizure violation, or from coercive methods which raise serious Fifth Amendment and due process concerns several factors should be examined to see whether the coercion carried over into the second confession. These factors include the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators. (*Oregon v. Elstad, supra,* 470 U.S. at p. — [84 L.Ed.2d at pp. 232-233].) Here, the first confession was the result of a serious Fifth Amendment right-to-counsel violation. Once the right to counsel has been invoked, all questioning must cease until counsel has been made available, unless the accused initiates further communication. (*Oregon v. Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405, 103 S.Ct. 2830]; *People v. Braeseke, supra,* 25 Cal.3d 691, 702.) Sergeant Kennedy violated this rule by continuing to

the age and intelligence of the defendant, the nature and degree of the influence, the time intervening between the confessions (*People v. Jones* (1944) 24 Cal.2d 601, 609 [150 P.2d 801]) and "*particularly, the purpose and flagrancy of the official misconduct.* [Fn. omitted.]" (*Brown v. Illinois* (1975) 422 U.S. 590, 604 [45 L.Ed.2d 416, 427, 95 S.Ct. 2254], italics added.)

■ Accepting the facts most favorable to the People, it is clear Dingle did not initiate the second interrogation when he asked Kennedy how much time he would get if he pleaded guilty. The second *interrogation* was suggested by Kennedy, undoubtedly because he knew the first confession had been illegally procured. Dingle did not volunteer any information about the crime or state he wished to repeat his earlier confession.

The facts here are not comparable with those in *People v. Knight* (1980) 111 Cal.App.3d 201 [168 Cal.Rptr. 421], where the defendant first confessed to police interrogators after asserting his right to remain silent. About two hours later he requested to speak to a different deputy whom he knew from an earlier stay at the jail. Expressing a desire to protect his little brother, he confessed to this officer. The court found the second confession was based on the defendant's own independent decision to talk to a deputy not involved in the initial interrogation, motivated by the extrinsic concern for his brother. (*Id.*, at pp. 204-205.)

Even were this a close case, and it is not, we would be required to evaluate Dingle's purported waiver of counsel in light of the effect of Kennedy's flagrant, purposeful abuse of Dingle's constitutional rights in obtaining the first confession. Kennedy's conduct during that event shows he was likely not concerned with legal niceties when he fortuitously again came in contact with Dingle, and his version of events can be construed only as police initiation of the second interrogation after Dingle's inquiry regarding sentencing. The court erred in admitting this second confession. Absent the illegally obtained confession, the evidence of Dingle's guilt on each charge is *totally circumstantial*. This error alone mandates the judgment be reversed. (*Chapman v. California* (1967) 386 U.S. 18, 22 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

---

question Dingle on February 1 after he requested an attorney. Although the *Elstad* decision does not specifically address the situation of a violation based on continued interrogation after the right to counsel has been invoked, this is clearly a violation requiring an examination of the *tainting effect on subsequent statements.* In refusing to rule that a non-Mirandized, but otherwise voluntary, statement is presumed to taint subsequent statements, the court noted that the failure to administer *Miranda* warnings can trigger the *Miranda* exclusionary rule, even in the absence of a Fifth Amendment violation. (*Oregan v. Elstad, supra,* 470 U.S. at p. — [84 L.Ed.2d at p. 230].) In contrast, when interrogation continues after the right to counsel has been invoked, a clear Fifth Amendment violation has occurred. (*Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880].) Accordingly, even under *Elstad,* the facts here require us to examine the effect of the first illegally obtained confession on the second confession.

Kennedy's improper interrogation of Dingle directly precipitated the telephone call to his father, which was tape recorded. The tape recording was introduced at trial. As a product of the illegal interrogation it is not admissible on any retrial.

Immediately after Dingle's first confession, Kennedy gave Dingle permission to make an additional call. Dingle called Nikita Howard and made certain indirect, but incriminating, admissions to which Howard testified at trial. Dingle argues this conversation also is inextricably tied to the illegal confession. We agree. The People do not argue otherwise. Evidence regarding the Dingle/Howard phone call is not admissible on retrial.

## II

ONE INTENTIONALLY DEFRAUDING THE PROVIDER OF TELEPHONE SERVICE TO AVOID PAYING THE SERVICE CHARGE, BY USING AN EXISTING TELEPHONE NUMBER WITHOUT THE AUTHORITY OF THE SUBSCRIBER THERETO, COMMITS THEFT[8]

Dingle was charged with entering his murder victim's home, on an earlier occasion, with the intent to commit theft. The theft allegedly occurred when Dingle placed a long distance call to a Chicago bank without the victim's consent. The charge for that service was billed to the murder victim. Dingle now contends this conduct is not theft, or, if theft, is not larceny. Dingle claims larceny is the only form of theft contemplated by the burglary statute, section 459, which states: "Every person who enters any house . . . with intent to commit grand or petit larceny . . . is guilty of burglary." He ignores the plain meaning of section 490a which states: "Whenever any law or statute of this state refers to or mentions larceny, embezzlement or stealing, said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor."

Section 484, subdivision (a), defining theft, was amended in 1927 to merge the former separately defined crimes of larceny, embezzlement and false pretenses into the general crime of theft. This merger, however, did not change the elements of the former crimes. (*People* v. *Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271].) The consolidation was "to relieve the courts from difficult questions arising from the contention that the evidence

---

[8]Section 502.7 states in pertinent part: "(a) A person who, knowingly, willfully and with intent to defraud a person providing telephone or telegraph service, avoids or attempts to avoid, or aids, abets or causes another to avoid the lawful charge, in whole or in part, for telephone or telegraph service by any of the following means is guilty of a misdemeanor:

"(1) By charging such service to an existing telephone number or credit card number without the authority of the subscriber thereto or the lawful holder thereof; or

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(5) By using any other deception, false pretense, trick, scheme, device or means."

shows the commission of some other of these crimes than the one alleged in the indictment or information, a contention upon which defendants may escape just conviction solely because of the border line distinction existing between these various crimes." (*People* v. *Myers* (1929) 206 Cal. 480, 484 [275 P. 219].) Dingle argues, regardless of the amalgamation of the ways in which property may be stolen into a single characterization as "theft," only larceny will support the specific theft element requirement of burglary because it requires an intent to deprive the owner of his property permanently, while some other types of theft, such as false pretenses, do not require the intent to permanently deprive the owner of his property. (See *People* v. *Randono* (1973) 32 Cal.App.3d 164, 172 [108 Cal.Rptr. 326]; *People* v. *Silver* (1975) 47 Cal.App.3d 837, 844 [121 Cal.Rptr. 153] (intent to restore property immaterial).) However, a plain reading of the statutes contradicts Dingle's assertion.

Section 490a not only changed section 484 so that the word "larceny" formerly used therein became superseded by the word "theft," but plainly means that the word "larceny" in section 459 shall now be read and interpreted as if the word "theft" were substituted. Because the word "theft" now encompasses acts in addition to those containing the elements of common law larceny, some of which do not require any intent to permanently deprive a person of property, one may commit the theft requisite for burglary by committing an act not containing that element. We believe the act of defrauding specified in section 502.7, subdivision (a)(1) is a theft akin to false pretenses. Thus, that act is sufficient to satisfy the theft element in an allegation of burglary and the court need instruct only in the language of section 502.7.

Judgment reversed.

Staniforth, Acting P. J., and Wiener, J., concurred.

A petition for a rehearing was denied November 18, 1985, and respondent's petition for review by the Supreme Court was denied February 27, 1986. Lucas, J., was of the opinion that the petition should be granted.