Filed 12/17/15  P. v. Lawrence CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B259517 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA410507) |
| v. | |
| DERYKE LAWRENCE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed in part, reversed in part, and remanded.

Tanya Dellaca, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Attorney General, Timothy M. Weiner and Eric J. Kohm, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted defendant and appellant Deryke Lawrence (defendant) of the first degree murder of Anita Henderson in violation of Penal Code section 187,[1] subdivision (a); he was also convicted on a separate charge of grand theft for unauthorized use of an ATM card. There were no witnesses at trial who saw or heard defendant kill Henderson, his next-door neighbor. The circumstantial evidence allowed the jury to infer that defendant entered Henderson's house without permission and to conclude that at some point while on the property he struck her head with such force as to fracture her skull and kill her. We consider whether the circumstantial evidence is sufficient to support the first degree murder conviction on either a felony murder theory or as a willful, deliberate, and premeditated killing. We also decide claims of related instructional error, and error in finding a prior "strike" conviction true for sentencing purposes.

## BACKGROUND

Trial of defendant on the murder and grand theft charges took place over nine days in June and July of 2014. The jury deliberated for three and a half hours and returned guilty verdicts on both charged offenses. The evidence at trial established the following facts.

Defendant worked as a handyman for Ray Ector for approximately two years. Ector lived with Henderson (the victim) in a house at 2121 South Redondo Boulevard in Los Angeles. Ector was also the temporary caretaker of a vacant house next door at 2115 South Redondo Boulevard (2115 Redondo). In the fall of 2012, defendant told Ector he was homeless and didn't have a place to live. Ector allowed defendant to live at 2115 Redondo.

Defendant knew Henderson for as long as he had been working for Ector. According to Ector, during the time that defendant lived next door, Henderson and defendant became friendly. They would talk together in Henderson's home. Defendant also ran errands for her.

---

[1] Undesignated statutory references that follow are to the Penal Code.

2

On November 1, 2012, defendant's car was impounded and defendant sought and obtained the temporary use of a pickup truck from Ector.[2] Defendant's stated reason for borrowing the truck was to move some furniture for his girlfriend, Arlene Anderson. After getting the truck, defendant met Anderson. She gave defendant her ATM card and permission to withdraw $40 for gas. Over the next several days, defendant withdrew about $1,200 from Anderson's bank account without her knowledge or permission. These withdrawals form the basis of defendant's grand theft conviction.

On November 5, when defendant had not returned the truck to Ector, Ector asked where it was. Defendant replied that he would bring it back when he was done with it. Two days after that, on November 7, defendant told Ector that the truck had been impounded. Ector was scheduled for a medical procedure the next day and he spent the evening at the house of a friend who could take him to the procedure early the next morning. At some point that evening, Ector called the sheriff's department and learned that his truck had not been impounded as defendant claimed. Ector's son Michael went to defendant's house, confronted him about the truck, and told him he would have to move out of 2115 Redondo if he did not return the truck by the next day.

Ector returned home around 3:30 the next afternoon, November 8, and encountered defendant coming out of the driveway of 2115 Redondo. Ector described defendant as looking "clean," meaning he was not wearing construction clothes. Defendant wore jeans and a dark hooded sweatshirt. Ector demanded defendant return the truck, and defendant agreed to take him to the truck. Once defendant was in Ector's vehicle, however, defendant convinced Ector to take him instead to an ATM, and then to take him back to 2115 Redondo. Ector thereafter went to a neighbor's house.

---

[2]      At trial, the prosecution contended the circumstances concerning defendant's use of Ector's truck provided evidence of a potential motive for Henderson's murder. Accordingly, the prosecution spent significant time during trial introducing evidence about the truck and related events that occurred prior to Henderson's death on November 8.

Unbeknownst to Ector, defendant put his belongings into the truck, which had been hidden in the area, and drove off. He abandoned the truck at about 5:00 p.m., when it stalled in an intersection. Ector's son Michael saw the truck later as he drove to Ector's house and alerted law enforcement to the truck's presence.

Meanwhile, Ector returned to his own house. When he went inside, he discovered Henderson's dead body on the patio. She was wearing only a bra and socks. A hose was positioned so that water was running over her body. There was disarray and blood in Ector's bedroom, but nothing else was out of place in the house and nothing was missing. Ector called 911.

Criminalists from the Los Angeles Police Department (LAPD) arrived at Henderson's house and took many photographs of the crime scene, including of Ector's bedroom. The photographs show substantial blood spatter on the wall. One section of blood spatter near the floor was over three feet wide, and a second section was just under three feet wide and about five feet above the floor.

There was no sign of forced entry at Henderson's house. The door from the den to the patio and backyard was open as usual to allow Ector and Henderson's dogs to come and go. The backyard was completely fenced. The front door was double-locked, and the gate to the driveway was also locked. Only Ector and Henderson had keys to the locks. Ector testified that it was unusual for the doors to be locked. He also testified that on November 7—the day before the murder—Henderson said she wanted the front door locked because defendant had done "some mean things to her." Ector was not asked to elaborate about what the "mean things" were.

An investigator with the coroner's office placed Henderson's time of death at 1:24 p.m. plus or minus two hours. The deputy medical examiner who performed the autopsy did not believe that the time of death could be so precisely pinpointed, stating that he would rely on the timeline of events established by the investigation of the crime as the most precise way to determine the window of time in which Henderson died.

The deputy medical examiner determined that Henderson died from blunt force trauma to the head. The examiner explained that there was an H-shaped fracture across

4

the left side of her skull, a large bruise over the eye and cheek area on the left side of her face, and a large laceration over her left eyebrow. Henderson also suffered contusions on the surface of the right side of her brain. The examiner observed small bruises on Henderson's arm and her legs that he believed were consistent with finger pressure. Henderson's body bore no signs of defensive wounds, that is, wounds that she would have suffered attempting to fend off an attack. The coroner's office investigator believed that a large bruise on the back of Henderson's left hand could be consistent with an offensive wound, but the examiner saw no definite signs of offensive wounds. The deputy medical examiner offered no opinion on whether Henderson died immediately from the blunt force trauma or survived for a period of time.

During the course of their investigation, the police searched Ector's truck that defendant had abandoned in the intersection. Investigators found a sweatshirt that appeared similar to the one worn by defendant during his drive to the ATM with Ector. A portion of the left cuff of the sweatshirt tested presumptively positive for blood and had DNA consistent with Henderson's DNA. Defendant and Henderson were major contributors to DNA recovered in a general swab of the sweatshirt. Defendant's DNA was not found on any items obtained from the victim or the crime scene, including swabs in a sexual assault kit.

While at the scene of the crime, police photographed a white plastic chair in the yard of 2115 Redondo next to the wall separating the property from Henderson's house. According to Ector, the chair was normally on the porch; he acknowledged, however, that he last visited 2115 Redondo two weeks before the murder and did not know when the chair might have been moved.[3]

Defendant did not have phone service at the time of the murder. A witness at trial who was working construction next door to Henderson's house testified that in the

---

[3]     During summation, the prosecution argued the presence of the chair near the fence permitted the jury to infer that defendant used the chair to climb over the fence and enter Henderson's house through the open den door to use her phone without her permission.

5

morning on November 8 (before Henderson was killed) defendant asked to use his cell phone to make a call. The prosecution admitted into evidence phone records for the two landlines at Henderson's house. The call records indicated that several local calls were made on the day of the killing from Henderson's line to a junk car dealer, beginning at 12:22 p.m. The phone number called for the junk car dealer matched the phone number on a business card in defendant's possession when he was arrested. Henderson's landline was also used to call the cell phone number for Anderson (defendant's girlfriend) at 12:30 p.m. Significantly, the records also showed a 32-second call from Henderson's landline to Ector's cell phone at 1:11 p.m.[4] Beginning at 1:29 p.m., several more calls were placed to the junk dealer from Ector's landline. After 2:07 p.m., there were no further outgoing calls until 5:03 p.m. The AT&T representative who testified at trial was not asked whether the local calls placed by defendant resulted in any additional charges to Henderson's telephone bill.

Approximately two weeks after Henderson was killed, defendant called Anderson and asked if she knew what happened to "Miss Anita" (i.e., Henderson). Anderson said no and defendant told her "they"—he did not say who—"beat her up." Anderson reported the conversation to the police, and later that same day, the police arrested defendant.

In a recorded post-arrest interview, police detectives told defendant they were investigating Henderson's murder. Defendant said, "I know Anita but I don't know no Henderson." When detectives again told defendant that Henderson had been murdered, he responded, "And?" The police told defendant they wanted to know what he knew about "Anita." They suggested it was suspicious that defendant "disappeared" after being at Henderson's house earlier that day, and asked defendant if he could explain. Defendant told the police that Henderson "was like a sister to me." He denied knowing what happened to her. But he did admit that he used Henderson's phone on the day of

_____

[4]  The prosecution focused on this call in closing argument, contending the jury could infer Henderson, and not defendant, made this call in an effort to warn Ector of something, perhaps that defendant was planning to sell Ector's truck.

6

the murder, claiming that he made calls outside on the porch with her permission. Defendant told the police that he might have called Anderson and he admitted he was "calling people about . . . the car and the truck trying to get . . . a value on that."

## DISCUSSION

Defendant contends (1) there is insufficient evidence to support his conviction for first degree murder; (2) the trial court should have instructed the jury on the lesser included offense of involuntary manslaughter; (3) the trial court should not have given a jury instruction on alternative theories of murder, CALCRIM No. 548; and (4) the evidence introduced of his prior Alabama robbery conviction did not establish the conviction qualified as a "strike" conviction under California law.

Under the applicable standard of review, we conclude there was sufficient evidence, although only just, to allow the jury to find first degree murder on a willful, deliberate, and premeditated theory. We are nevertheless compelled to reverse because we cannot conclude the jury based its first degree finding on that theory rather than the prosecution's felony murder theory—which was legally inadequate. We reject defendant's contention that an involuntary manslaughter instruction was warranted. We need not reach the question of whether giving the CALCRIM No. 548 instruction was error. Lastly, the People concede, and we agree, that there is insufficient evidence to prove defendant's Alabama conviction was a "strike" conviction.

We therefore reverse the first degree murder finding and the trial court's true finding on the prior conviction allegation. We affirm the grand theft conviction. We remand for further proceedings.

## I
## Murder Conviction

The prosecution urged the jury to find defendant guilty of first degree murder under either of two theories: commission of a felony murder in the course of a burglary or, alternatively, commission of a willful, deliberate, and premeditated murder. The

7

primary difference between the two theories was that under the felony murder theory, defendant's use of Henderson's phone on the day of the murder was characterized as a theft but under the premeditation and deliberation theory it was not.

We have no difficulty concluding there was sufficient evidence of malice to support a second degree murder conviction. But first degree murder is not so straightforward. As to felony murder, the prosecution presented the jury with a theory of the underlying felony that was legally inadequate; compounding the problem, the jury instruction the trial court gave on the elements of the underlying felony, while legally correct, had no application to the facts of the case. As to the prosecution's alternate theory that defendant killed Henderson willfully, deliberately, and with premeditation, the evidence was not strong but it was minimally sufficient under the deferential standard of review that governs our review. The jury was therefore left with a legally adequate and a legally inadequate theory of first degree murder. Applying Supreme Court precedent, we conclude reversal is required.

### A. Malice Aforethought

Murder is the unlawful killing of another person with malice aforethought. (§ 187.) Malice may be express or implied, or where the felony murder doctrine applies, it is necessarily imputed to the defendant. (§ 188; *People v. Chun* (2009) 45 Cal.4th 1172, 1184.) A defendant acts with express malice when he intends to kill. A defendant acts with implied malice when he willfully commits an act, the natural and probable consequences of which are dangerous to human life, knowing the act is dangerous to human life and with conscious disregard for human life. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

Defendant hit Henderson in the head with considerable force. The coroner's report shows a large "H" shaped fracture on one side of her skull which caused contusions to the opposite side of the brain. In addition, she had a possibly broken nose, bruises and cuts on her face, and bruising around her eyes. Photos taken in a bedroom show over three feet of blood spatter over one wall, and large amounts of blood on items

8

on the floor underneath the spatter and on the front of the desk perpendicular to the spattered wall. The force required to produce such results was necessarily extreme force. The force and resulting injuries are sufficient to demonstrate defendant acted with at least implied malice. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1222; *People v. Toth* (1960) 182 Cal.App.2d 819, 826 [malice may be shown by the extent and severity of the injuries inflicted upon the victim]; see *People v. Lashley* (1991) 1 Cal.App.4th 938, 945.) When combined with evidence of motive and the other circumstantial evidence, the jury was also entitled to find express malice. (*People v. Smith* (2005) 37 Cal.4th 733, 742.)

## B. First Degree Murder

A murder is first degree murder if it is committed during the commission of certain specified felonies, including burglary. (§ 189.) An unlawful killing with malice aforethought is also first degree murder if it is willful, deliberate, and premeditated. (§ 189.) Here, the prosecutor argued both theories to the jury. Defendant contends the first degree murder conviction cannot be sustained under either theory.

### 1. Felony murder

A killing committed in the course of a burglary is automatically first degree murder under the felony murder rule. (§ 189.) A burglary occurs when a person unlawfully enters a building with the intent to commit theft or any felony therein. (§ 459.)

The prosecution's theory of burglary as the predicate for felony murder was that defendant intended to commit a theft when entering Henderson's house because he intended to use Henderson's phone to make calls without her authorization. During summation, the prosecutor stated, "[I]t doesn't matter what you use in a house. If it's a residence, that makes it first degree. And if you're using something inside without permission, that constitutes theft." During rebuttal argument, the prosecution returned to the same point, arguing, "[U]sing a phone without permission in someone's house is absolutely a theft."

9

On appeal, respondent defends the description of theft that the prosecution offered at trial. Respondent's brief asserts: "Appellant's . . . argument that use of a phone to make local calls does not constitute theft is . . . preposterous. Entry with the intent to use a home's utilities may form the basis of a burglary conviction. (*People v. Martinez* (2002) 95 Cal.App.4th 581, 584-585 [the defendant was found guilty of burglary after he entered a home with the intent to take a shower] (*Martinez*); see also *People v. Dingle* (1985) 174 Cal.App.3d 21, 29 [entry for the purpose of making long-distance telephone calls] (*Dingle*).)"

There was ample evidence at trial that defendant used Henderson's telephone to make local calls. The jury was also entitled to infer that defendant used Henderson's phone without permission (indeed, that he entered Henderson's home without permission) based on Ector's testimony that defendant had done mean things to Henderson and she wanted to keep the doors locked, combined with the placement of the plastic chair near the wall separating 2115 Redondo and Henderson's house. But the prosecution's assertion that the mere use of a phone without permission constitutes theft was an oversimplification and invited the jury to convict on a legally inadequate theory of the predicate burglary.

Defendant's unauthorized use of Henderson's phone to make local telephone calls was not a theft from her. Theft by larceny requires that a thing taken have some intrinsic value, and the thief must intend to deprive the owner permanently of property or to deprive the owner of a major portion of the property's value or enjoyment. (*People v. Franco* (1970) 4 Cal.App.3d 535, 542 [intrinsic value]; see also *People v. Avery* (2002) 27 Cal.4th 49, 58 [intent to deprive the owner permanently of the property or to deprive the owner of a major portion of the property's value or enjoyment].) There was no evidence at trial that defendant's use of Henderson's phone to make local calls resulted in any additional charges to Henderson's phone bill or that defendant intended to permanently deprive her of any property.

*People v. Martinez* (*Martinez*) therefore provides no support for the prosecution's overbroad theory of theft ("if you're using something inside without permission, that

10

constitutes theft"). In *Martinez*, the defendant entered the home to use "soap, shampoo and hot water." (*Martinez*, (2002) 95 Cal.App.4th 581, 585-586.) The Court of Appeal held that the use and consumption of these items was a permanent taking of personal property, albeit property of very slight value, that would qualify as theft by larceny.[5] (*Ibid*.) That is not true based on the evidence the jury had—or more precisely, did not have—concerning defendant's use of the telephone. *Martinez* does not help respondent.

Respondent also relies on the Fourth District Court of Appeal's decision in *People v. Dingle* (*Dingle*) to argue that the prosecution's articulation of burglary's theft element was correct. Respondent's reliance on *Dingle*, however, is similarly misplaced. The case stands only for a narrower proposition: unauthorized use of a telephone to make calls billed to a subscriber can satisfy the theft element of a burglary charge *if* a jury is properly instructed on what it must find, including an intent to defraud the "person" providing telephone service.

The defendant in the *Dingle* case was convicted, among other offenses, of first degree burglary with intent to commit theft. (*Dingle, supra*, 174 Cal.App.3d at p. 24.) The theft alleged was a long distance call Dingle made without the victim's consent. (*Id.* at p. 29.) Dingle argued on appeal that the unauthorized call was not a theft, or if it was a theft, that the jury instructions omitted an essential element: intent to permanently deprive the victim of possession of property. (*Id.* at pp. 24, 29.) The Court of Appeal reversed the judgment of conviction on other grounds but, "for purposes of guiding the trial court on retrial," addressed the issue of whether Dingle's use of the phone to make a long distance call satisfied the intention-to-commit-a-theft element of burglary. (*Id.* at p. 24.)

The Court of Appeal concluded that an intention to commit any theft offense described in section 484, subdivision (a)—not just larceny—can satisfy the elements of burglary. (*Dingle, supra,* 174 Cal.App.3d at p. 30 ["the word 'larceny' in section 459

---

[5]     Theft of electricity, gas, and water services—but not telephone services—are also punishable pursuant to section 498, entitled "Theft of utility services; definitions; presumptions; penalties." (§ 498, subd. (a)(2) [definition of "utility"].)

11

[the burglary statute] shall now be read and interpreted as if the word 'theft' were substituted"]; see also §§ 484, 490a.) The court stated that larceny requires an intent to permanently deprive a person of property, but certain other theft offenses do not. (*Dingle, supra*, at p. 30.) Theft by false pretenses is one such form of theft,[6] and the Dingle court held that section 502.7—which punishes theft of telephone service by fraud—is akin to theft by false pretenses and therefore sufficient to satisfy the theft element in an allegation of burglary. (*Ibid.*) The Court of Appeal stated that on remand for retrial of Dingle, "the court need instruct [the jury] only in the language of section 502.7." (*Ibid.*)

The statute cited by the *Dingle* court, section 502.7, provides: "Any person who, knowingly, willfully, and with intent to defraud a person providing telephone or telegraph service, avoids or attempts to avoid, or aids, abets or causes another to avoid the lawful charge, in whole or in part, for telephone or telegraph service" by any of several specified means is guilty of a misdemeanor or a felony.[7] (§ 502.7, subd. (a).) Here, there was no

---

[6]     Theft by false pretenses requires proof that "1. The defendant knowingly and intentionally deceived a property owner [or the owner's agent] by false or fraudulent representation or pretense; [¶] 2. The defendant did so intending to persuade the owner [or the owner's agent] to let the defendant [or another person] take possession and ownership of the property; [¶] AND [¶] 3. The owner [or the owner's agent] let the defendant [or another person] take possession and ownership of the property because the owner [or the owner's agent] relied on the representation or pretense." (CALCRIM No. 1804; *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.) Theft by false pretenses must also be corroborated by either a false writing or false token, a note signed or handwritten by the defendant, or testimony from two witnesses or testimony from one witness plus other evidence supporting the conclusion that the defendant made the pretense. (CALCRIM No. 1804.)

[7]     Under section 502.7, the theft of telephone service by fraud is a theft from the service provider, here AT&T, not the subscriber. One means of such theft specified in the statute occurs where a person "charge[s] the service to an existing telephone number or credit card number without the authority of the subscriber thereto or the lawful holder thereof." (§ 502.7, subd. (a)(1).) Another specified means occurs where a person uses "any other deception, false pretense, trick, scheme, device, conspiracy, or means,

12

evidence, as there was in *Dingle*, that defendant's use of Henderson's phone to make local calls resulted in charges billed to the victim. More important, the trial court gave no jury instruction on the elements of a section 502.7 theft by fraud. Nor did the prosecution argue theft by fraud under section 502.7 or even a general theory of theft by false pretenses as the basis for the burglary predicate for felony murder. Instead, the prosecution made the blanket statement that intending to use the phone was an intention to commit a theft.

The instructions the trial court *did* give on the elements of theft did not cure the problem with the prosecution's oversimplified theory of theft—in fact, the instructions could have only served to confuse matters. The court's instructions correctly informed the jury that defendant must have intended to commit a theft when entering a building, and that to decide whether defendant intended to commit theft, the jury should refer to the separate instructions given by the court. The only jury instruction the trial court gave on the elements of theft was CALCRIM No. 1800. That instruction provides that the People must prove "1. The defendant took possession of property owned by someone else; [¶] 2. The defendant took the property without the owner's consent; [¶] 3. When the defendant took the property he intended to deprive the owner of it permanently; [¶] AND [¶] 4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief."

CALCRIM No. 1800 had no application to the facts relevant to felony murder. It defines the offense of theft by larceny. (*People v. Beaver* (2010) 186 Cal.App.4th 107, 119, 122 ["This instruction applies to situations where a defendant physically takes property from another's actual or constructive possession"].) The trial court correctly gave this instruction in connection with defendant's theft of money from Anderson, the grand theft offense charged in count two of the information. The theft by larceny instruction, however, was not appropriate for the prosecution's felony murder theory

___

including the fraudulent use of false, altered, or stolen identification." (§ 502.7, subd. (a)(5).)

13

because no physical property was taken from Henderson's house nor was there any evidence that defendant intended to permanently deprive Henderson of any property.

"While a general verdict of guilt may be sustained on evidence establishing any one of the consolidated theft offenses [citation], the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict." (*People v. Curtin* (1994) 22 Cal.App.4th 528, 531; accord, *People v. Kunkin* (1973) 9 Cal.3d 245, 250-251 [because jury instructed only on theft by larceny, court could not look to embezzlement theory not before the jury in seeking to reconcile jury verdict with the substantial evidence rule]; *People v. Beaver, supra,* 186 Cal.App.4th at p. 123.) Here, the theft instruction given to the jury did not include the elements of a section 502.7 theft, so even if there were sufficient evidence to support such a charge, the failure to instruct on those elements violated defendant's right to have the charges decided by the jury. (*People v. Beaver, supra,* at p. 125 [jury was instructed on theft by larceny; if defendant committed theft, it was theft by false pretenses].) The jury was accordingly left with a legally inadequate theory of burglary and therefore felony murder, uncured by any instruction from the trial court.

## 2. Willful, deliberate, and premeditated murder

The prosecution's alternate theory of the murder was that defendant killed Henderson willfully, deliberately, and with premeditation. Because there were no witnesses to the killing, the prosecution was forced to rely entirely on circumstantial evidence. The prosecution contended the murder was premeditated by focusing on the testimony concerning defendant's deteriorating relationship with Henderson shortly before the murder; the events on the day of the murder, including the phone calls from Henderson's telephone line; and the manner in which defendant killed Henderson, as established by the forensic evidence.[8]

---

[8] The prosecution argued in closing: "Was [Henderson's] murder willful, deliberate and premeditated? That bludgeoning. That's not an accident. The wounds and that wall,

14

"'"'[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]'" (*People v. Williams* (2015) 61 Cal.4th 1244, 1281; see also *People v. Combs* (2004) 34 Cal.4th 821, 849 ["An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise"].) The same standard of review applies where the prosecution relies on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) Where the circumstances reasonably justify the jury's findings, the opinion of the Court of Appeal that the circumstances could be reconciled with a contrary finding does not require reversal. (*Id*. at pp. 792-793.)

"In [the context of first degree murder], 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.) "'The process of

the blood, it speaks for itself. [¶] Is it deliberate? Yes. You know because the only reason he would do this is because she was going to do something he didn't like. . . . [¶] The last phone call is at 1:11. [Defendant]'s going to do something she doesn't want him to do. Like stop him from selling the truck or tell [Ector] what's going on. He makes a decision to stop her from doing it. So he deliberated. Do I let her stop me or do I get rid of her? [¶] Hitting her with that amount of force, the amount of force that's required for those injuries, tells you that. Is it premeditated? Well, he let himself into the house. He thinks about what he's doing. He climbs that wall to get into the door that he knows is open, and he uses [Ector's] phone. [¶] It's a continuous, building intent. What are the logical inferences? [Henderson] did not invite [defendant] in to use the phone. She said he had done some mean things to her before. [Henderson] told [Ector] she wanted to lock those locks. Both locks were locked."

15

premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . " [Citations.]'" (*People v. Lee* (2011) 51 Cal.4th 620, 636.)

The leading case discussing the sufficiency of premeditation and deliberation evidence is *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*). In that case, our Supreme Court explained: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a pre-existing reflection and careful thought and weighing of considerations rather than 'mere unconsidered or rash impulse hastily executed'; . . . [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for 'a reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id*. at pp. 26-27.)

The *Anderson* factors do not establish strict rules, and they are not a sine qua non to finding deliberation and premeditation. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32.) But they do provide guidelines for a reviewing court's analysis. (*Ibid*.; *People v. Raley* (1992) 2 Cal.4th 870, 886 [when evidence of all three *Anderson* factors are not present, appellate courts look for either very strong evidence of planning or some evidence of motive in conjunction with planning or a deliberate manner of killing].)

16

### a.    Motive

It is undisputed that defendant and Henderson had a relationship prior to the day he killed her.  This is not, therefore, a case in which the jury was left to search elsewhere for a motive because of the absence of any "prior relationship and/or conduct with the victim."  (*Anderson, supra*, 70 Cal.2d at p. 27 [italics omitted]; compare *People v. Caro* (1988) 46 Cal.3d 1035, 1050, overruled on another ground by *People v. Whitt* (1990) 51 Cal.3d 620, 657, fn. 29 [no evidence of prior relationship, but jury could reasonably infer defendant killed victim because she was an actual or potential witness to kidnapping].)

Substantial evidence at trial permitted the jury to conclude the relationship between defendant and Henderson became antagonistic before the murder took place.  Ector provided uncontradicted testimony that defendant had come to Henderson's house and done some mean things to her.  Although Ector was not asked by either the prosecution or the defense to explain what the "mean things" were, Ector did explain that Henderson was sufficiently concerned to have asked him—when he left just the day before the murder—to make sure the front door to her house was locked because she did not want defendant in the house.[9]

Defendant, however, did come on Henderson's property the next day, the day he killed her while Ector was away undergoing a medical procedure.  The jury could properly rely on the placement of the white plastic chair near the wall separating 2115 Redondo and Henderson's house, in combination with Ector's testimony that the chair was not normally in that location, to infer that defendant gained access to Henderson's property without her permission by hopping over the wall.

Having drawn such an inference, the jury could properly rely on the phone call records to make reasonable inferences about what happened once defendant was on Henderson's property.  The records established that defendant made five short telephone calls (the longest was 47 seconds and the others were all 25 seconds or less) to a junk car

---

[9]    Ector's trial testimony on this point, that Henderson wanted the doors locked to keep defendant out of the house, was also what he told police when first interviewed on the day of the murder.

dealer using Henderson's phone, and defendant admitted in his post-arrest interview that the purpose of the calls was to "get a value on that," i.e., Ector's truck. The next outgoing call following the calls to the junk car dealer was the 1:11 p.m. call from Henderson's phone to Ector's cell phone, and the jury was entitled to conclude Henderson made that call to Ector; there was no evidence that suggested any reason why defendant would have been calling Ector at the time. After the 1:11 p.m. call, there were no further outgoing calls on Henderson's line until after 5 p.m. Defendant did make three additional short calls to the junk car dealer starting at 1:29 p.m., but he switched to using Ector's phone line to make those calls.

With Ector's unrebutted testimony that Henderson did not want defendant in her house and undisputed evidence that defendant nevertheless made calls from her telephone, the jury could reasonably infer that defendant killed Henderson to prevent her from talking to Ector. The investigator for the coroner's office put the time of death at roughly 1:24 p.m., which was between the last call made from Henderson's phone line (the 1:11 p.m. call to Ector's cell phone) and the resumed attempts by defendant to reach the junk car dealer that started at 1:29 p.m. The jury could reasonably believe the purpose of Henderson's 1:11 p.m. call to Ector was to warn him about defendant's plans to sell Ector's truck, as the prosecution argued, or it may have simply been to ask for Ector's help because she had found defendant on her property without her permission or because defendant was doing "mean things" to her again. But the motive to kill would be the same in each scenario: the relationship between Henderson and defendant had become antagonistic, Henderson did not want defendant in the house and tried to contact Ector, and defendant acted to prevent Henderson from reaching Ector (or anyone else) by killing her.

### b. Planning and the manner of killing

Under the remaining two *Anderson* factors, we consider whether there is evidence of planning activity that reveals a premeditated intention to kill and whether the manner

18

of the killing is particular and exacting in a way that suggests an intention to kill according to a preconceived design. (*Anderson, supra*, 70 Cal.2d at pp. 26-27.)

The evidence of planning activity was quite minimal. There was no evidence, for example, that defendant brought the murder weapon, whatever it might have been, with him. (Compare *People v. Young* (2005) 34 Cal.4th 1149, 1183 [evidence of planned entry with a gun supports inference of plan to kill].) But that is not to say there was no evidence whatsoever. In *People v. Tully* (2012) 54 Cal.4th 952, our Supreme Court stated that a defendant's care in eliminating his fingerprints from the victim's residence was some evidence of planning activity. (*Id.* at p. 1008, fn. 24.) Here, there was no evidence that defendant eliminated fingerprints, but there was evidence that defendant took care to eliminate or remove other physical evidence. The testimony from the criminalists, the coroner's investigator, and Ector, along with the exhibits admitted at trial, established that defendant dragged Henderson's dead body to the patio, removed most of the clothing she was wearing at the time, positioned a hose so that water was running over her body, and used the house's bathroom or the kitchen to wash her blood off him. Like the elimination of fingerprints in *People v. Tully*, the care taken by defendant to eliminate physical evidence gives rise to an inference that he was acting according to a plan to kill, not reacting to an unexpected or unconsidered state of affairs.

The manner in which defendant killed Henderson provides further evidence of premeditation. The coroner testified that Henderson was killed by blunt force trauma to her head. Defendant fractured the left side of Henderson's skull and there were also other non-fatal injuries to Henderson's head and face. By contrast, the rest of her body was nearly wound free, a point the prosecution highlighted during closing argument.[10] Our

---

[10] There was a bruise on the back of Henderson's left hand, but there was no testimony concerning the cause of that injury. There were also small bruises on Henderson's arm and on her legs, but the medical examiner testified that those bruises were consistent with finger pressure.

During closing argument the prosecution called attention to the lack of other injuries: "He [the deputy medical examiner] tells you the cause of death is blunt-force trauma to the head. There are little to no injuries anywhere else on her body. There are

Supreme Court has found blunt force injuries focused entirely on a victim's head probative of premeditation and the jury could reach the same conclusion on the facts here. (*People v. Cruz* (1980) 26 Cal.3d 233, 245 ["[T]he killings [of the defendant's wife and two child victims] by blows to only the head and by a shotgun blast in his wife's face permit the jury to infer that the manner of killing was so particular and exacting that defendant must have killed intentionally according to a preconceived design and for a reason"]; see also *People v. Hovey* (1988) 44 Cal.3d 543, 556.)

To be sure, there is at least one case in which the court appeared to take a contrary view. (*People v. Lucero* (1988) 44 Cal.3d 1006, 1020 [strangulation of one victim was a deliberate manner of killing suggestive of premeditation but manner in which another victim was killed, multiple blows to the skull from a blunt object, "much less suggestive" of premeditated murder].) In this case, however, there was evidence not just of defendant's near-exclusive focus on Henderson's head, but also of defendant's demeanor near in time to when he attacked Henderson. Relying on the phone records and the testimony from the coroner's investigator, the jury could conclude that defendant killed Henderson around 1:30 p.m. Only two hours later, around 3:30 p.m., defendant encountered Ector outside 2115 Redondo and asked Ector to drive him to an ATM. On the way, defendant told Ector, "You have been in control and now I'm in control." Ector also testified on cross-examination that defendant appeared very calm during the drive, which was just two hours after defendant had killed Henderson, dragged her bleeding body outside, and taken steps consistent with an effort to wash away forensic evidence. From defendant's demeanor shortly after the killing and the blows he inflicted only to Henderson's head, the jury could infer his actions that caused her death were not the product of an unconsidered or rash impulse but the desired culmination of a preexisting intention. (*People v. Lee* (2011) 51 Cal.4th 620, 636 [manner of killing indicative of

---

small bruises on her arm. There are small bruises on her leg. About the size of fingerprints. From being drug out of the house."

premeditation where defendant was calm when shooting victim multiple times and continued to be "calm and collect[ed]" on the way home, after the victim's death].)

### 3. Summary and Analysis of Prejudice

Viewing the record as a whole, we cannot say that the evidence at trial was so deficient as to preclude any rational trier of fact from concluding that defendant had committed a deliberate and premeditated murder. We have in this case the second scenario contemplated by the *Raley* court—evidence of motive combined with some evidence of planning and/or a manner of killing that is indicative of a preconceived plan to kill. That is not to say, however, the evidence of premeditation was strong. It wasn't, and that weighs heavily in the analysis of prejudice we now undertake.

The jury had before it a legally inadequate theory of felony murder advanced by the prosecution and uncured by a correct jury instruction, as well as a legally adequate theory of premeditated murder. "When one of the theories presented to a jury is legally inadequate . . . the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1233; accord, *Griffin v. United States* (1991) 502 U.S. 46, 58-59; *People v. Guiton* (1993) 4 Cal.4th 1116, 1121-1122 ["'[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand,'" quoting *People v. Green* (1980), 27 Cal.3d 1]; *People v. McDonald* (2015) 238 Cal.App.4th 16, 27.) Our Supreme Court's decision in *People v. Chun, supra*, 45 Cal.4th 1172 states that we must be able to conclude, beyond a reasonable doubt, that the jury based its verdict on the legally valid theory in order to find the error harmless. (*Id.* at p. 1203 [if other aspects of the jury's verdict or the evidence

leave no reasonable doubt that the jury made the findings necessary for the legally valid theory, the error is harmless]; see also *People v. Chiu* (2014) 59 Cal.4th 155, 167.)

Felony murder is the theory that the prosecution primarily emphasized when urging the jury to convict defendant of first degree murder.  Understandably so, because that theory was the far easier of the two to prove, particularly with the prosecution's oversimplified definition of theft.  The prosecutor described the deliberate and premeditated theory as an "alternate theory," in contrast to the felony murder theory that was "automatically first degree":  "Is [defendant] guilty of first degree murder?  Felony murder, yes.  That's pretty clear.  Is he guilty of murder under an alternative theory?  The judge gave you two instructions. . . .  [¶] . . . [¶]  To get to first degree without felony murder, you need willful, deliberate and premeditated."  As we have already explained, the case for premeditated murder was sufficient but not strong.  Confronted with both a relatively weak theory of premeditated murder that would require carefully parsing the evidence and drawing multiple inferences, and an apparently stronger (albeit legally inadequate) felony murder theory that would "automatically" justify a first degree finding, we are convinced the jury likely opted for the straightforward theory and not the one that respondent acknowledges was "far from overwhelming."  Although we recognize the danger that generally inheres in drawing conclusions based on the amount of time a jury deliberates, we believe the short amount of time the jury was out here— two and a half hours before lunch and one hour after—is some further indication that the jury arrived at its decision based on the less complicated felony murder theory rather than the weaker and more complicated premeditated murder theory.

We therefore hold reversal is required under the circumstances.  There is nothing about the jury's guilty verdicts here, as there was in *People v. Chun, supra*, 45 Cal.4th at p. 1205, that would allow us to reliably conclude the jury rendered its first degree murder finding on a legally valid theory.[11]

---

[11]    We certainly have no basis to conclude beyond a reasonable doubt that the jury based its verdict on the premeditated murder theory.  Moreover, on this record, we would

## II

### Instruction on Alternative Murder Theories (CALCRIM No. 548)

In a supplemental brief, defendant contends that the first degree murder conviction must also be reversed because the trial court's decision to instruct the jury with CALCRIM No. 548 on alternate theories of murder was error. The instruction informed the jury that it did not need to agree on the same theory of murder in order to convict the defendant. Defendant contends jurors may have understood this instruction to permit them to convict defendant of first degree murder even though some jurors believed he committed only second degree murder. Since we have found the first degree murder finding must be reversed, we do not reach this claim.

## III

### Lesser Included Instruction on Involuntary Manslaughter

Defendant contends the trial court had a sua sponte duty to instruct the jury on the lesser included offense of involuntary manslaughter and that the court's failure violated his federal constitutional rights to due process and a fair trial.

"Instruction on a lesser included offense is required . . . when the record contains substantial evidence of the lesser offense, that is, evidence from which the jury could reasonably doubt whether one or more of the charged offense's elements was proven, but find all the elements of the included offense proven beyond a reasonable doubt. (*People*

_____

reach the same result—the conclusion that the first degree murder finding was infected by prejudicial error—even if we employed the more permissive standard for harmlessness that applies when a court confronts a factually inadequate, rather than a legally inadequate, theory of guilt. (*People v. Guiton, supra,* 4 Cal.4th at p. 1130 ["[T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory"]; cf. *People v. Poindexter* (2006) 144 Cal.App.4th 572, 586-587 [affirming conviction where prosecutor spent more time in closing arguing the valid premeditation theory of murder and jury deliberated for one full day and an hour the next day before returning its verdict].)

*v. Hughes* (2002) 27 Cal.4th 287, 365; *People v. Breverman* (1998) 19 Cal.4th 142, 162.)" (*People v. Moore* (2011) 51 Cal.4th 386, 408-409.)

"Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. (*People v. Rios* (2000) 23 Cal.4th 450, 460.)" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.) "[T]here are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony. (See [*People v. Garcia* (2008) 162 Cal.App.4th 18, 27-29].) . . . [F]or all three types of predicate acts the required mens rea is criminal negligence." (*Ibid*.)

"If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.) Criminal negligence is judged under an objective standard. Thus, a person acts with criminal negligence when he "acts in a reckless way that creates a high risk of death or great bodily injury" and a "reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 580.)

Defendant argues this case involves the first of these predicate acts. He contends "gaps in the evidence left considerable room for reasonable doubt that the offense committed was murder, and shows nothing more than a simple battery." We are not persuaded. We have already reviewed, *ante*, the evidence that demonstrates defendant's crime was far more than a simple battery. The injuries and the force required to produce such injuries was necessarily extreme force, likely to cause great bodily injury. (See *People v. Covino* (1980) 100 Cal.App.3d 660, 667 [nature and extent of any injury inflicted is a relevant and often controlling factor in determining if force used was likely to cause great bodily injury].) Thus, defendant committed a serious felony rather than a simple misdemeanor battery. (See *People v. Moore* (1992) 10 Cal.App.4th 1868, 1871 [battery causing serious bodily injury is a serious felony, within the meaning of section 1192.7, subdivision (c)(8)].)

24

Further, the evidence, especially the photos of the blood spatter, is not consistent with the hypothetical scenario defendant offers on appeal: that he pushed Henderson and she fell and hit her head. Nor was there any substantial evidence at trial offered by the defense (or prosecution) to suggest such a scenario occurred. Moreover, we have also already detailed the evidence, particularly the evidence as to motive, that allowed the jury to infer defendant intended to kill Henderson when using such force.

Because the jury could not reasonably have found that defendant committed involuntary manslaughter but not murder, the trial court did not err in failing to instruct the jury on involuntary manslaughter.

## IV

## Prior Alabama conviction

The trial court found true the allegation that defendant had suffered a conviction in Alabama which qualified as a prior serious felony conviction within the meaning of section 667, subdivision (a), and the Three Strikes law (sections 667, subdivisions (b) through (i) and 1170.12). The court sentenced defendant to a total term of 59 years to life in state prison, consisting of a term of 25 years to life in state prison for the murder conviction, doubled to 50 years to life pursuant to the Three Strikes law, plus a five-year enhancement term pursuant to section 667, subdivision (a), plus a two-year term for the theft conviction, doubled to four years pursuant to the Three Strikes law.

Defendant contends and respondent agrees that the prosecution presented insufficient evidence from which the court could find that this prior conviction for robbery in Alabama was a strike or serious felony conviction under California law. We reach the same conclusion.

A prior conviction from another jurisdiction qualifies as a strike if the out of state conviction includes all the elements of a strike offense in California. (§ 667, subd. (d)(2).) To determine if the prior conviction so qualifies, the trier of fact "may 'look beyond the judgment to the entire record of the conviction' . . . 'but no further.'" (*People v. Trujillo* (2006) 40 Cal.4th 165, 177.) The record of conviction consists of matters in

25

the record that establish the facts of the offense for which the defendant was convicted. (*Id*. at pp. 179-180 [statements in post-guilty plea probation report not part of record of conviction].)

Defendant's prior conviction was for first-degree robbery in violation of Alabama Code, title 13A, section 13A-8-41 (1975). That statute incorporates the elements of third-degree robbery under 13A-8-43, and further requires either that a defendant be armed with a deadly weapon or dangerous instrument or that the defendant cause serious physical injury to another. Our Supreme Court has noted at least one distinction between the underlying third-degree robbery statute in Alabama and the California robbery statute, section 211. (*People v. Nguyen* (2000) 24 Cal.4th 756, 763, fn. 4 [California robbery statute requires the property to be taken "from the possession" of the victim].) Thus, the mere fact of a conviction for robbery in Alabama does not establish all of the elements of robbery in California. The prosecution was required to show through the record of the Alabama conviction that the Alabama robbery contained all of the elements of a robbery in California. (*People v. Saez* (2015) 237 Cal.App.4th 1177.)

That did not happen here; all that was presented was an Alabama document similar to a California probation report. The trial court erred in relying on the factual summary in the report. The trial court's true finding on the prior conviction allegation is reversed, and the matter is remanded for a retrial on the allegation or, if the People elect not to retry the allegation, for resentencing. (*People v. Monge* (1997) 16 Cal.4th 826, 843 ["federal double jeopardy clause does not apply to the trial of the prior conviction allegation"].)

26

## DISPOSITION

The conviction for first degree murder is reversed and the matter is remanded for a new trial. Unless the People bring defendant to trial within the term prescribed by law after issuance of the remittitur, the trial court shall proceed as though the judgment on appeal had been reduced on count one to second degree murder.

The judgment is reversed as to the true finding on the prior conviction allegation arising out of defendant's Alabama robbery conviction and the matter is remanded to the trial court for further proceedings consistent with this opinion.

The conviction on count two of the information is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.


I concur:


TURNER, P.J.


27

The People v. Deryke Lawrence
B259517


MOSK, J., Concurring




     I concur.

     I concur in the result.  I do not believe there is sufficient evidence of premeditation and deliberation.  The prosecutor's theory was based only on speculation.  The inferences used to support premeditation and deliberation are consistent with second degree murder.



              MOSK, J.