Filed 3/23/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDRE MYLES,<br><br>    Defendant and Appellant. | D079825<br><br>(Super. Ct. No. SCN422268) |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Reversed and remanded with instructions.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kathryn Kirschbaum and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A homeless man named Andre Myles broke a window and entered an unoccupied Oceanside house.  During the 15 hours he was inside, he did not

take anything of significant value.  But he drank a juice box and ate ice cream belonging to the owner, and he charged the battery in the owner's vehicle.  Several months later, Myles tried to break into the house again.

The only disputed issue at Myles's trial for first degree residential burglary and attempted first degree residential burglary was whether he had the specific intent to commit theft when he entered or tried to enter the house.  Myles claimed he did not have the required specific intent.  He presented evidence he suffered from a mental disorder that caused him to experience delusions, and at the time of each incident, these delusions caused him to believe the home belonged to him because it had been given to him by an "entity" named "Archangel Michael."

The trial court modified the pattern instruction on the definition of theft by larceny (CALCRIM No. 1800) by adding this sentence:  "The unauthorized use of utilities in a residence or consumption of property within the home is considered larceny for purposes of Burglary."  The modified instruction also contained citations to appellate decisions involving burglary charges arising from alleged incidental use of utilities and consumption of food inside a victim's home, with these parenthetical factual summaries: "holding that making a long-distance call constituted intent to commit larceny" and "theft of utilities could not be proven without evidence that entrant intended to use utilities and did in fact use utilities."  The jury convicted Myles of both charges.

We conclude the trial court committed prejudicial instructional error when it modified the definition of theft and provided the jury with citations to appellate decisions that included factual summaries of other burglary cases.  Consequently, we reverse Myles's convictions of burglary and attempted burglary and remand for possible retrial.

2

I.

*Charges*

In an amended information in case SCN422268, Myles was charged with first degree residential burglary (Pen. Code,[1] §§ 459, 460, subd. (a); count 1) and attempted first degree residential burglary (§§ 459/664, 460, subd. (a); count 2).[2] It was further alleged that Myles committed counts 1 and 2 while he was released on bail or his own recognizance on another matter (§ 12022.1, subd. (b)), and that he had a serious felony prior (§ 667, subd. (a)(1)) and a strike prior (§§ 667, subds. (b)–(i), 1170.12, & 668).

II.

*Evidence*

A. *Prosecution's Case*

1. *The May 2020 Burglary (Count 1)*

Jake D. lived in Los Angeles. He also had a house in Oceanside that was legally owned by his mother but was in probate due to his mother's death. Jake was the only resident of the Oceanside house, which he periodically visited.

In April 2020, Jake's father went to the house to do yard work and housekeeping. The house appeared normal and nothing was out of place. Jake's van was parked in the garage and his father tried to charge the van's battery because it was dead. He changed his mind after realizing he was

---

[1] Further unspecified statutory references are to the Penal Code.

[2] Myles was also charged with two misdemeanors, possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 3) and battery (Pen. Code, § 242; count 4). He pled guilty to both of these charges before trial on counts 1 and 2.

3

unsure how to use the charger, left the van in the garage with the charger next to it ready for use, and put the van keys back into a container on the kitchen counter where they were normally kept. He locked all of the house doors when he left.

Jake had equipped the house with a security system that alerted him on his cell phone when the doors and windows with alarm sensors were opened or closed. On the afternoon of May 1, 2020, Jake started receiving alerts of unexpected activity at the house. He was first alerted that the security system touch screen inside the house had lost power. He then received additional alerts of entries through the front door and interior garage door that continued into the early morning of May 2.

At 7:44 a.m. on May 2, Jake went to check on the house. His van was parked in the driveway instead of the garage. He checked the backyard, saw no one, and returned to the front door. As he was about to insert his key to open the front door, "the doorknob turned and the door opened and this gentleman was there." It was Myles.

Surprised, Jake asked Myles, "[W]ho are you? What are you doing here?" Myles told Jake "he lived there and that it was his house." Myles "seemed serious [to Jake], . . . he said that he lived there, that was his house." Jake stepped back from the doorway and called 911. When Jake told Myles, " 'this is my house homeboy, you're going to have to leave,' " Myles asked him, "this is your house?" Myles also asked, "Are you Jake?"[3] "There was some back and forth regarding whose house it actually belonged to." Myles then

_____

[3]    Jake explained Myles would have no reason to know his name, but he did keep bills and paperwork that had his name on them on the kitchen counter.

said he would leave if Jake showed him "some form of identification" so "he could confirm that it is, in fact, Jake."

Jake, who was now inside the house, showed Myles his identification. Upon seeing Jake's identification, Myles went to gather "his stuff" that was near a nightstand and while there he grabbed a pair of scissors.[4] Jake was still on the phone with the 911 dispatcher. The dispatcher asked Jake what Myles was doing and when he told the dispatcher about Myles grabbing the scissors, the dispatcher told Jake to back away from Myles. As Jake "walked backwards to the front door," two police officers arrived at the home and arrested Myles. The scissors, a cell phone, and a plastic bag containing methamphetamine were found on Myles during a patdown search.

After Myles was arrested, Jake walked through the house with the officers and made the following observations. The kitchen window had been broken, and there was a hole next to the latch that locked the window. The security system touch screen had been unplugged and was lying face down. The kitchen lights and a lamp were on. Various items were moved around or out of place, including the van keys. An empty juice box, as well as an empty pack of cigarettes, were in the trash can. Jake had purchased the juice box, but not the cigarettes. A crushed ginger ale can and a juice were on the kitchen counter although they were normally kept in the closet or refrigerator. Jake also found a Circle K bag, a can of malt liquor, a bag of clothes, and a phone charger that did not belong to him.

---

[4]     Myles testified he grabbed the scissors because he was using them to hold the piece of glass with which he smoked methamphetamine.

Jake had never met Myles and had never given Myles permission to enter his home, use his utilities or property, or consume his food or beverages.

### 2.    *The January 2021 Attempted Burglary (Count 2)*

After Myles's entry into the house, Jake installed a Ring surveillance system that provided him with real time or "simultaneous surveillance" of the house on his cell phone.  At 11:40 p.m. on January 14, 2021, Jake was alerted by the Ring security system.  When he looked at his cell phone, he saw "Myles was back at [his] house."  Myles was in the back yard, holding a rock.  He hit the same kitchen window that was previously broken but the window did not break.

### 3.    *The Uncharged December 2019 Burglary*

The prosecution presented evidence of an uncharged burglary pursuant to Evidence Code section 1101, subdivision (b), to show planning, absence of mistake, and a common modus operandi.

Sara S. lived with her husband and young children in an apartment in Vista.  She knew Myles as "an old friend."  She had helped him in the past by giving him food and letting him stay at her apartment for one day.  She knew Myles "had a drug problem" and he had been "in and out of rehab."

At 9:00 p.m. on December 22, 2019, Sara and her husband were inside their apartment when "Myles showed up" and was "banging" on their front door.  Her husband asked Myles "why he was acting outrageous" and banging on their door.  Myles told them, "I'm going to break in, let me in, I'm going to break in."  He was "yelling outrageous crazy stuff" and "saying things that did not make any sense," including that he believed Sara was being held hostage by her husband.  He was "yelling, screaming, saying I'm going to break into your house, let me in, let me in."

6

Sara then heard a loud noise. Myles had broken a window in her children's bedroom and was trying to get inside the apartment. Sara told Myles she was calling 911. Myles had half his body through the window. When Sara's husband went to get a bat, Myles removed himself from the window and began pacing back and forth outside the apartment. The apartment's security guard came by and "somehow got [Myles] to sit down and was talking to him" before the police arrived. Sara was "very confused" about Myles's behavior because they had "never been . . . on bad terms." He "looked like he was intoxicated" or "maybe he was under the influence of some type of drugs."

In addition to Sara's testimony, the prosecution presented the jury with evidence of Myles's conviction of first degree residential burglary (§§ 459, 460, subd. (a)) of Sara's apartment in case No. SCN408839.[5]

B.    *Defense Case*

    1.    *Myles's Post-Arrest Statements*

Myles presented evidence of his statements to the police officers who arrested him for the uncharged burglary and the charged crimes. Officer Ellyn Bell, who responded to Sara's apartment on December 22, 2019, testified she was unable to take a statement from Myles because he was carrying on a conversation with himself. Officer Mackenzie Flynn responded

---

[5]    A minute order admitted in evidence showed that on April 17, 2020, Myles pled guilty to the burglary charge. In the same case, Myles also pled guilty to assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)), arising from an incident in which Myles stole a pack of cigarettes from a convenience store and pushed the store clerk. Myles was out on bail or on his own recognizance pending sentencing on this matter when he committed the May 2020 burglary and January 2021 attempted burglary. This is the basis of the 12022.1, subdivision (b) allegations attached to the current offenses.

to Jake's house both times, on May 2, 2020 and January 14, 2021. Each time Officer Flynn spoke with Myles, she had her bodyworn camera on.

The bodyworn camera recording of Myles's post-arrest interview on May 2, 2020 was played for the jury. In it, Myles explained his mother rented a home "around the corner" from Jake's house "seven years ago." Jake's house was on "the path [he used] to smoke or access [his] mom's house," and it had "been empty for a few years." An "old relative" of Myles who sometimes stayed in Jake's house told him he could stay there. Because his relative "had no key for [him] to get in," Myles entered the house by breaking the back window and climbing in. He had been "staying [t]here" by himself since the previous night. Other than the window, he had not destroyed or taken any property from the house. He did drive the van to the Circle K and explained, "I was told it was my car." When he came back, he intentionally parked the van in the driveway "so it wouldn't be like [he] was being sneaky . . . [he] wanted all the neighbors to see that [he] drove it." The van belonged to his "old relative" who "gave it to [him]." The relative also told him "the whole house is [his]." Myles told Officer Flynn, "It's my house."

Myles could not give Officer Flynn the name of the relative and explained the relative usually contacted him on his cell phone. Myles told Officer Flynn the relative had called him on his cell phone that morning. He then unlocked his phone with the password so Officer Flynn could review his recent calls. When Officer Flynn could not find any calls from such a person, Myles explained the call came on his second phone but he did not know where that phone was.

When Officer Flynn contacted Myles the second time on January 14, 2021, she found his demeanor during her interactions with him to be "serious," and that he was "not joking." Based on what she saw and heard,

8

Officer Flynn did not think Myles "was in touch with reality." She explained that Myles "made several statements that both supported that he was within . . . reality and statements that were not."

2. *Myles's Testimony*

Myles has been treated by different doctors for mental health issues since his "20s," which included auditory and visual hallucinations.[6] He has been prescribed Abilify, Zyprexa, Prozac, and Wellbutrin. At the time of trial, Myles was on the last three medications, which were administered to him by the Sheriff's Department while he was in their custody. At the time of trial, he still heard voices. The medications he took "limits it" but methamphetamine "enhances it."

Myles explained his auditory and visual hallucinations increased following an "event" in January 2016. He described the "event" as: "Something within me goes up my spine and opened up my pineal gland, it went all the way up my back and opened up my paragon, my third eye. And when it did, I looked to the right and I looked to the left, and it bellowed out 'Earth' -- and it was a voice of many wisdom waters and it just went -- (indicating noise) -- and it did it three times." This "threw [his] reality into another place." Since the "event," Myles had "been on a spiritual awaking path."

Regarding the break-in at Sara's apartment in December 2019, Myles said he went there because he was homeless and cold, and he wanted to see what Sara was doing. He was greeted by Sara's husband, who would not let Myles speak to Sara. Myles was "under the impression that women were being sex trafficked" in a "spiritual" sense, and he believed Sara "was being

---

[6]    Myles was approximately 36 years old at the time of trial.

held against her will" by her husband.  Myles was concerned for Sara and so he stayed until the police arrived so he "would know that she was actually okay."  Based on this incident, Myles pled guilty to residential burglary because "the [plea] deal . . . was going to get [him] out" of jail that same day.

Myles had become aware of the Oceanside house in 2016 when it was empty and under construction.  Myles saw parallels between the house's construction progress and his own spiritual path.  In 2018, he got the house address to contact the owner about renting it, and he saw numbers in the address that struck him as coincidental.

Myles explained:  In 2020, "through internal stimuli I was communicated to by my entity that that place was actually mine -- or was going to be given to me -- that it was part of my walk and at the end of my spiritual walk . . . that house was to represent me being home and me being done . . . it's like a gift or whatever for me going through what I went through."  These communications came from his "entity" named "Archangel Michael."  It was "very normal" for the Archangel Michael to appear to Myles "to where [Myles] could see a vague outline of him."  One day the Archangel Michael told Myles, "that's your house[.]"  Myles believed the house "was waiting for [him] to be able to start studying and start delivering a message to the people" because he was "Jesus Chris[t] reincarnated."  Because he was Jesus Christ reincarnated, Myles "could easily see how there would be a house waiting for [him] at the end."

When Myles entered the house in May 2020, he believed the house and its contents were his.  He went in because he was homeless and cold.  He did not intend to steal when he entered.  But while inside, he drank a juice box and he ate "their" ice cream.  He went into the garage and saw a van.  He took the battery out, charged it, put the battery back in, started up the van,

10

and drove it to the Circle K. When he returned to the house, he left the van in the driveway "on purpose" because he wanted the neighbors to know he was there. Myles did not remove anything from the house. When asked why not, he responded, "Why would I want to steal from myself?"

In the morning, Myles was sitting in the living room when he heard "keys jingling" at the door. He opened the door to find a man standing there. The man asked Myles "what was [he] doing there[?]" Myles responded, "I have permission to be here, it's my house." Myles asked the man, "who are you . . . are you Jake?" Myles had seen Jake's name on bills and paperwork inside the house. When the man said he was Jake, Myles told him, "if you can show me ID, . . . I'll leave, because I was under the impression that it was okay for me to be there. So unless you show me that you're this guy, I'm not leaving." When Jake complied, Myles went to gather his "stuff." Myles grabbed the scissors that he was using to hold the piece of glass he used to smoke methamphetamines.

Myles returned to the house on January 14, 2021. He explained that he was in custody facing charges stemming from the first time he entered the Oceanside house when he was unexpectedly released from custody on his own recognizance. This "completely surprised and shocked" him. His release led Myles to think, "I'm Jesus Christ reincarnated" and "everybody is with me, . . . they can understand that I'm Jesus. They understand that that was my house." When he returned to the house, he planned to enter it because he believed it was his. He wanted to get out of the cold because he was homeless and freezing. He did not intend to steal anything inside.

On cross-examination, Myles acknowledged he understood there was a difference between his spiritual reality and his physical reality. He denied intending to commit theft when he entered Sara's apartment, but he agreed

11

he was capable of forming the intent to commit theft. The same day he broke into Sara's apartment, he stole a pack of cigarettes from a convenience store. He had also stolen food when he was homeless and hungry, even though he did not "agree with it" and explained, "But me doing something to a person's home is a completely different thing that I did not do."

In 2018 and 2019, he knew the Oceanside house was somebody else's house. He did not come to believe it was his house until 2020. He admitted he unplugged the touch screen for the alarm system after he entered the house. He explained he did so because "the house wasn't ready" or "prepared for [him] yet," and he knew he was entering it early to get out of the cold. "[S]o of course [he] unplugged the alarm system."

3. *The Forensic Psychologist's Testimony*

Raymond Gerard Murphy, Ph.D., is a clinical and forensic psychologist on the Superior Court panel for mental health professionals. He conducted a clinical evaluation of Myles, which included interviewing Miles on five separate occasions, reviewing police reports and recordings of Myles's interviews with law enforcement.

Dr. Murphy's opinion of Myles was that he was bipolar with psychotic features. Myles suffered from a major depressive order with periods of manic activity, and he exhibited psychotic behavior "which took on the dimensions of a delusional type of thinking."

Myles's symptoms included auditory and visual hallucinations as well as delusions. Zyprexa is a major antipsychotic medication. If Myles was being administered Wellbutrin, Prozac, and Zyprexa by the San Diego Sheriff's Department, this would be consistent with Murphy's opinion that Myles was bipolar with psychotic features. Myles also had substance abuse problems, including use of methamphetamines. Methamphetamines have

12

the effect of exacerbating a mental health condition and can increase the impact of delusions on an individual.

Dr. Murphy opined that on May 2, 2020 and January 14, 2021, Myles appeared to be experiencing delusions such that he believed the house was his. A delusion is "a belief in something that's not true." Delusional symptoms vary significantly. Some people have fixed, specific delusions, such as erotomania, in which the individual believes someone famous loves them. Or a person may be categorized as a "general delusional," in which "the individual feels that they have significant powers" and "that people are out to get them." Some delusional people may be so seriously impaired they are incompetent. Others may understand what is going on around them and may be able to conduct ordinary life activities, like going to the store.

Dr. Murphy did not believe Myles was malingering, but he agreed Myles had incentive to malinger. Malingering means to fabricate symptoms for the purpose of secondary gain. If a person made bizarre statements without believing them, he would be malingering rather than delusional. Dr. Murphy acknowledged that Myles was not mentally incompetent. Individuals suffering from bipolar disorder with psychotic features can still exhibit goal-directed behavior. Myles's current functioning "appears to be quite lucid" and Myles "was well aware of his current circumstances."

### III.

### *Jury Instructions*

As we have noted, the only disputed issue at trial was whether Myles acted with the mental state required for convictions on first degree residential burglary and attempted first degree residential burglary. On this disputed issue, the trial court gave the jury four relevant instructions.

13

A. *CALCRIM No. 1700 Burglary*

The jury was instructed that to prove Myles was guilty of burglary as charged in count 1, the prosecution had to establish:

"1. The defendant entered [the Oceanside home];

"2. When he entered [the Oceanside home], he intended to commit theft; [¶] AND

"3. The structure that the defendant entered was a noncommercial establishment."

This instruction also told the jury: "To decide whether the defendant intended to commit theft please refer to the separate instructions . . . on that crime."

B. *CALCRIM No. 460 Attempted Burglary*

The jury was instructed that to prove Myles was guilty of attempted burglary as charged in count 2, the prosecution had to establish:

"1. The defendant took a direct but ineffective step toward committing a burglary; [¶] AND

"2. The defendant intended to commit a burglary."

This instruction also told the jury: "To decide whether the defendant intended to commit burglary, please refer to the separate instructions . . . on that crime."

C. *Modified CALCRIM No. 1800 Theft Defined*

On the elements of theft, the jury was given a modified version of the CALCRIM No. 1800 pattern instruction.

The **unmodified** part of the instruction told the jury:

"The defendant is charged in Counts 1 and 2 with burglary and attempted burglary. Both crimes require an intent to commit theft. Theft is defined as:

"1. Taking possession of property owned by someone else;

"2. Taking the property without the owner's consent;

14

"3.	When taking the property the defendant intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property;

"AND

"4.	The defendant moved the property, even a small distance, and kept it for any period of time, however brief."

The instruction also included the optional sentence from the pattern instruction: "The property taken can be of any value, no matter how slight."

At the prosecution's request, and over the objection of the defense, the trial court added the following sentence to the end of the theft instruction so that the **modified** part of the instruction told the jury:

"The unauthorized use of utilities in a residence or consumption of property within the home is considered larceny for purposes of Burglary."

Although not part of the instructions read to the jury, the written instruction sent into the deliberation room with the jury also included the following notes underneath the instruction:

"*Copy of CALCRIM No. 1800, Revised August 2016, except adaptations and utilities pinpoint language from* People v. Martinez (2002) 95 Cal.App.4th 581, 585; People v. Dingle (1985) 174 Cal.App.3d 21, 29 (holding that making a long-distance call constituted intent to commit larceny); In re Leanna W. (2004) 120 Cal.App.4th 735, 742 (Establishing that theft of utilities could not be proven without evidence that entrant intended to use utilities and did in fact use utilities)."

These notes do not appear in the bench notes for the CALCRIM No. 1800 pattern instruction.

D.	*CALCRIM No. 3406 Mistake of Fact*

The jury was also instructed on the defense's theory of mistake of fact, as follows:

15

"The defendant is not guilty of Burglary and Attempted Burglary if he did not have the intent or mental state required to commit the crime because he did not know a fact or mistakenly believed a fact.

"If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit Burglary and Attempted Burglary.

"If you find that the defendant believed that Jake['s] house was the defendant's house, he did not have the specific intent or mental state required for Burglary and Attempted Burglary.

"If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for Burglary and Attempted Burglary you must find him not guilty of those crimes."

## IV.

### *Closing Arguments, Verdict, and Sentencing*

The prosecutor argued Myles was guilty of burglary and attempted burglary because he acted with intent to steal when he entered and attempted to enter Jake's home. He asserted that all the physical evidence pointed to the fact that Myles harbored such an intent at the time of the May 2020 entry. He argued breaking and entering through a window, and unplugging a security system, were acts that showed criminal intent. He reminded the jury that Myles had admitted to eating food and drinking beverages inside the home. He argued, "the best evidence that somebody has an intent to steal, [is] the fact that they actually steal things." Because Myles had the intent to steal when he entered the home in May 2020, the prosecutor argued, this was also his intent when he tried to reenter the home in January 2021.

Defense counsel told the jury the only disputed issue in the case was whether Myles acted with intent to commit theft when he entered and tried to enter Jake's home, and emphasized that the prosecution had the burden to

16

prove this issue beyond a reasonable doubt. She argued Myles did not have the intent to steal on either occasion because he expressly denied acting with the intent to take anything in the home and because he was experiencing delusions that led him to believe the home and its contents were his. She pointed out that Dr. Murphy testified Myles was exhibiting delusional thought processes when he was interviewed by law enforcement. She further argued Myles's actions when he was inside the home were consistent with the belief he was the owner, and inconsistent with the behavior of a person who intends to rob or steal, since he did not take any items of significant value.

In rebuttal to defense counsel's argument that Myles lacked the required intent to steal, the prosecutor directed the jury to the modified portion of the theft instruction (CALCRIM No. 1800). The prosecutor then argued: "[I]t is not the intent to commit theft and take a diamond necklace[.] [T]he jury instruction is very clear that the value can be slight, even nonexistent. And in fact, that jury instruction does tell you that you can consume electricity and food and other items. . . . It's just that you consume and that you steal. When you enter into a home and you use the items as if they were your own, when you charge your phone, when you drink the juice, when you sleep in there, when you break the window, when you disarm a system, you are stealing. That is you using the items in the home. That is theft."

After deliberating for six hours, the jury found Myles guilty of burglary (§ 459; count 1) and attempted burglary (§§ 459/664; count 2). The jury found true that the burglary and attempted burglary were of an inhabited dwelling house (§ 460, subd. (a)), and that a person was present in the residence during the commission of the burglary making it a " 'violent felony' " (§ 667.5, subd. (c)(21)). In a bifurcated proceeding, the trial court found true the out-

17

on-bail enhancement allegations (§ 12022.1, subd. (b)), as well as allegations Myles had suffered a serious felony prior (§ 667, subd. (a)(1)) and strike prior (§§ 667, subds. (b)–(i), 1170.12, & 668).

In December 2021, the trial court held a combined sentencing hearing in case Nos. SCN422268 and SCN408839. In the present case, case No. SCN422268, Myles received a total prison sentence of 15 years and four months. On count 1, the court imposed a total prison term of 14 years, consisting of the upper term of six years for the first degree burglary, doubled to 12 years due to the strike prior, plus two years for the out-on-bail enhancement. On count 2, the total consecutive term was 16 months, consisting of one-third the midterm of two years for the attempted burglary, doubled due to the strike prior. The court either struck or imposed concurrent terms with respect to the remaining counts and allegations.

In the case involving the burglary of Sara's apartment, case No. SCN408839, Myles received a total sentence of two years and four months, consecutive to the term imposed in this case. The aggregate term in both cases was 17 years and eight months. Myles filed a timely notice of appeal in the present case.

## DISCUSSION

On appeal, Myles contends the trial court erred by modifying the CALCRIM No. 1800 instruction defining theft by larceny. Specifically, he contends it was error for the court to add the sentence, "The unauthorized use of utilities in a residence or consumption of property within the home is considered larceny for purposes of Burglary," and to include the notes of appellate decisions with parenthetical summaries of burglary charges arising from alleged incidental use of utilities and consumption of food inside a victim's house. Myles argues these modifications were erroneous and

18

argumentative, and resulted in the jury receiving a definition of theft that lightened the prosecution's burden of proof.

We agree. We reverse on the prejudicial instructional error, but we reject Myles's claim that there was insufficient evidence supporting his burglary and attempted burglary convictions. We need not and do not reach Myles's remaining claim on appeal in which he seeks a remand for resentencing in accordance with an ameliorative change in the determinate sentencing law.

## I.

### *Myles Has Not Forfeited His Claims of Error for Appeal*

The People first contend Myles has forfeited any appellate challenge to the inclusion of the case citations and parenthetical summaries in the modified CALCRIM No. 1800 instruction. Although Myles's trial counsel objected to the proposed modification to add the sentence regarding unauthorized use of utilities and consumption of property, the People argue counsel's failure to separately object to inclusion of the case citations and parenthetical summaries forecloses his claim of that asserted error. Not so.

"Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) Myles's claim, however, is that inclusion of the citations and parenthetical summaries were argumentative and *not* "correct in law," and contributed to lightening the prosecution's burden to prove all elements of burglary and attempted burglary, in violation of his federal constitutional rights. No objection was necessary to preserve this claim. (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 ["Defendant's claim . . . the instruction is *not* 'correct in law,' and that it violated his right to due process of law . . . is not of the type

19

that must be preserved by objection."].) "The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; see *People v. Johnson* (2015) 60 Cal.4th 966, 993 ["even without a request, a defendant may argue the court erred in instructing the jury 'if the substantial rights of the defendant were affected thereby.' (§ 1259.)"].)[7]

## II.

### *The Trial Court Committed Instructional Error*

We review de novo claims of instructional error like those that Myles has asserted. "The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We consider "whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

On our de novo review, we conclude the trial court erred by modifying the CALCRIM No. 1800 pattern instruction. As we will explain, the modifications resulted in the jury receiving an alternative definition of theft that was erroneous and argumentative, and had the effect of lightening the prosecution's burden of proof with respect to the mens rea required for burglary and attempted burglary.

---

[7] Because we conclude an objection was not necessary, we need not and do not consider Myles's alternative argument that his trial counsel rendered ineffective assistance of counsel by failing to object.

Burglary is committed when a person enters a structure with the intent to commit a felony or theft.[8] (§ 459.) The entry does not need to be a trespass. (*People v. Frye* (1998) 18 Cal.4th 894, 954, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "One may by liable for burglary upon entry with the requisite intent to commit a felony or a theft[.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041–1042.) "The duty to define such so-called target offenses [of burglary] and instruct on their elements has become well established." (*People v. Hughes* (2002) 27 Cal.4th 287, 349 (*Hughes*).)

"The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away." (*Davis*, *supra*, 19 Cal.4th at p. 305.) "The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking freely and unconditionally or the taker has a legal right to take the property. [Citation.] The intent to steal or *animus furandi* is the intent,

---

[8] Section 459 uses the phrase "intent to commit grand or petit larceny" rather than "intent to commit theft." However, both phrases have the same meaning under California law. "Section 484, subdivision (a), defining theft, was amended in 1927 to merge the former separately defined crimes of larceny, embezzlement and false pretenses into the general crime of theft. This merger, however, did not change the elements of the former crimes." (*People v. Dingle* (1985) 174 Cal.App.3d 21, 29 (*Dingle*); accord *People v. Davis* (1998) 19 Cal.4th 301, 304–305 (*Davis*).) "Since that time, any statutory reference to 'larceny' is read as if it were the word 'theft.' (§ 490a.)" (*People v. Avery* (2002) 27 Cal.4th 49, 53, fn. 4. (*Avery*).) CALCRIM No. 1800 is the pattern instruction for theft by larceny. Because this was the species of theft the prosecution sought to prove in this case, when we use the term theft, we are referring to theft by larceny.

without a good faith claim of right, to permanently deprive the owner of possession." (*Ibid.,* fns. omitted.)

"California courts have long held that theft by larceny requires the intent to *permanently* deprive the owner of possession of the property." (*Avery, supra,* 27 Cal.4th at p. 54; *id.* at p. 57 [" '[T]he intent to deprive an owner of the main value of his property is equivalent to the intent to permanently deprive an owner of property.' "].) Unless the taker acts with this intent, "there is no larceny." (5 Witkin, Cal. Criminal Law (4th ed. 2022) Crimes Against Property, § 23.) " 'It is clear that a charge of larceny, which requires an intent to steal, could not be founded on a mere careless taking away of another's goods.' " (*People v. Devine* (1892) 95 Cal. 227, 229; *People v. Photo* (1941) 45 Cal.App.2d 345, 353 ["Felonious intent is an essence of the crime of larceny."].)

A defendant who takes property in the mistaken belief it belongs to him therefore lacks the intent required for theft. (*People v. Hendrix* (2022) 13 Cal.5th 933, 940 (*Hendrix*).) This type of mistake of fact claim "is often described as a 'defense' to the charge. [Citation.] But the term is somewhat misleading, because mistake of fact is, generally speaking, 'not a true affirmative defense.' [Citation.] It is, rather, an assertion by the defendant that a particular factual error in his perception of the world led him to lack the mens rea required for the crime." (*Ibid.*, fn. omitted.)

Here, the unmodified part of the CALCRIM No. 1800 instruction correctly defined theft as: "1. Taking possession of property owned by someone else; [¶] 2. Taking the property without the owner's consent; [¶] 3. When taking the property the defendant intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the

value or enjoyment of the property; [¶] AND [¶] 4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief." The third element described the required specific intent.

The jury was also correctly instructed in accordance with the standard CALCRIM No. 1800 instruction that the property taken could be "of any value, no matter how slight." (See *People v. Franco* (1970) 4 Cal.App.3d 535, 542–543 [the taking of a carton of cigarettes could support a petty theft conviction, even if the jury found the carton was empty]; *People v. Martinez* (2002) 95 Cal.App.4th 581, 585 (*Martinez*) [defendant's intent to take a shower using even a miniscule amount of the homeowner's soap, shampoo, and hot water constituted the intent to commit theft].)

But the additional sentence the trial court added to the pattern instruction at the prosecution's request gave the jury an alternate, incomplete definition of theft that omitted the required specific intent.[9] This modification told the jury: "The *unauthorized* use of utilities in a residence or consumption of property within the home is considered larceny for purposes of Burglary." (Italics added.) The phrases "use of utilities" and "consumption of property" described acts which, in an appropriate case, may constitute a taking of property.[10] The word "unauthorized" conveyed the concept that

---

[9]    We assume the jury understood that larceny is synonymous with theft. (See Amer. Heritage Dictionary (2d College ed. 1985) p. 714, col. 2 [defining "larceny," in part, as "theft"]; *People v. Gray* (2005) 37 Cal.4th 168, 231 [jurors are presumed to comprehend the court's instructions].)

[10]    It is not necessarily true that every case involving incidental use of utilities in a home will result in even a slight deprivation to the homeowner. Here, for example, Myles's only admitted use of utilities involved charging a vehicle battery that belonged to Jake. Even assuming this involved use of the home's electricity (and no evidence was presented that this was so), it is

23

someone (perhaps the owner, although the sentence does not specify this) had not consented to the use or consumption. But nothing in this description of the offense of theft conveyed that the defendant had to act with the specific intent to permanently deprive the owner of the utilities used, or the property consumed. By leaving out any description of the defendant's mental state, the modification effectively turned theft into a strict liability offense.

We agree with Myles this case presents an example of the danger of relying on appellate opinions to "embellish" on standard jury instructions. (*People v. Colantuono* (1994) 7 Cal.4th 206, 221–222 ["we admonish trial courts not to embellish on the standard jury instructions for assault and assault with a deadly weapon unless compelled by the peculiar facts of the case"].) "The discussion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind." (*Id.* at p. 221, fn. 13.) Here, the prosecution evidently crafted the modification based on the facts of the three appellate decisions referenced in the notes in the written instruction provided to the jury: *Martinez, supra,* 95 Cal.App.4th 581; *Dingle, supra,* 174 Cal.App.3d 21; and *In re Leanna W.* (2004) 120 Cal.App.4th 735 (*Leanna W.*). These cases all dealt with narrow issues arising from a burglary involving defendant's alleged incidental use of utilities and consumption of items inside the victim's home. None of them involved a claim the defendant believed the home was his.

In *Martinez,* the defendant was convicted of burglary after admitting at trial that he entered the victim's home with the intent of taking a shower

---

debatable whether the use resulted in any permanent or extended deprivation of property to Jake.

24

with soap and shampoo. (*Martinez*, *supra*, 95 Cal.App.4th at pp. 584, 585.) On appeal, the defendant argued the " 'miniscule amount' " of soap, shampoo, and hot water used were too insignificant in value to be considered property for purposes of section 484, subdivision (a). This court affirmed on the basis that an item qualifies as property for purposes of the theft statute so long as it has "some intrinsic value, however slight." (*Martinez*, at pp. 585–586.)

In *Dingle*, the defendant was charged with committing burglary by entering his murder victim's home with the intent to commit theft. (*Dingle*, *supra*, 174 Cal.App.3d at p. 29.) The alleged theft occurred when the defendant placed an unauthorized long-distance call from the victim's home phone and the charge for the call was billed to the victim. (*Id.* at pp. 25, 29.) On appeal, the defendant argued the definition of theft for purposes of burglary is limited to larceny. This court disagreed and held the term "theft" embraces other kinds of unlawful takings, and that the defendant's act was a form of "theft akin to false pretenses" that could support a charge of burglary. (*Id.* at pp. 29–30.)

The court in *Leanna W.* held that a juvenile court's finding of burglary could not be upheld based on evidence the lights were on and the homeowner's liquor was missing after the juvenile had an unauthorized party in her grandmother's home, because there was no evidence the juvenile was the one who consumed the liquor or turned on the lights, and there was therefore no evidentiary support for the inference the juvenile intended to commit theft at the time of entry. (*Leanna W.*, *supra*, 120 Cal.App.4th at pp. 741–742.)

In each of these cases, because there was no question of mistaken ownership, the defendant's intent to use the utilities or consume the property while inside the victim's house could be equated with an intent to

25

permanently deprive the victim of those items.  There was no need for these courts to separately address whether the defendant's mental state matched the mental state required for theft.  As a consequence, modifying the theft instruction to provide the jury with a definition of theft that was based on summaries of the holdings of these cases gave the jury a truncated definition of theft that left out the required specific intent.

Not only was the modification erroneous as a matter of law, but it was also impermissibly argumentative.  An argumentative instruction is one that invites the jury to draw an inference favorable to one party from specified items of evidence on a disputed question of fact.  (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.)  "A court may—and, indeed, must—refuse an instruction that is argumentative, i.e., of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1276, disapproved on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835.)

Although the modification here did not go so far as to specify items of evidence, it defined the offense in terms of basic facts (use of utilities, consumption of property) that were both undisputed and easily identifiable from the evidence.  It used mandatory language, telling the jury that either of the specified acts "*is considered* larceny for purposes of Burglary." (Italics added.)  And because the modification appeared at the end of the instruction and defined the offense of theft in terms of fact patterns similar to the fact patterns before the jury, there is a reasonable likelihood the jury would have understood it as presenting a definition that incorporated all the legal requirements of the crime in one neat factual summary.

The effect the modification likely had on the jury can easily be seen if one considers the evidence already before the jury when it received the

instruction. By that time, Myles had already admitted to drinking a juice box, eating ice cream, and charging the van's battery while he was inside Jake's house. It was therefore undisputed that Myles "use[d] utilities in a residence" and "consum[ed] property within the home." Jake's testimony supplied the additional fact—and the only other circumstance necessary to complete the crime, according to the modified instruction—that the use and consumption was "unauthorized." As phrased, the modification gave the jury no option except to reach the conclusion favoring the prosecution—that Myles committed the target offense of theft after entering Jake's home, a conclusion the prosecution could then rely on as circumstantial proof that Myles intended to commit theft at the time of entry.

Although we would find instructional error on the basis of the foregoing modification alone, the addition of the notes with parenthetical summaries of *Dingle* ("holding that making a long-distance [phone] call constituted intent to commit larceny") and *Leanna W.* ("[e]stablishing that theft of utilities could not be proven without evidence that entrant intended to use utilities and did in fact use utilities") exacerbated the error. Although the trial court did not read this text to the jury, it was included (we assume inadvertently) in the written instruction provided to the jury during their deliberations. Generally, when there is a discrepancy between a written instruction and an oral instruction, the written instruction controls. (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 803; *People v. Osband* (1996) 13 Cal.4th 622, 717.)

The parties debate whether the summaries of *Dingle* and *Leanna W.*, which do not appear in the bench notes for CALCRIM No. 1800, were accurate. Although we agree with Myles they were inaccurate, that is beside the point. Accurate or not, they tended to reinforce the error introduced by the earlier modification of presenting mere use of utilities as a form of theft,

27

with no consideration given to whether the use was committed with the required criminal intent. ("Intent to use utilities" does not constitute such criminal intent.)

The trial court's erroneous modifications of the CALCRIM No. 1800 instruction had the effect of lightening the prosecution's burden of proof with respect to burglary and attempted burglary. A jury cannot determine that a defendant intended to commit a crime unless it is properly instructed on all the elements of that crime. By leaving out the mental state required for theft, the erroneous modification removed the need for the prosecution to prove beyond a reasonable doubt one of the essential facts necessary to establish that Myles's intent when he entered or attempted to enter the house constituted the intent to commit theft.

Specific intent offenses are more difficult for the prosecution to prove. " ' "While the existence of the specific intent charged at the time of entering a building is necessary to constitute burglary in order to sustain a conviction, this element is rarely susceptible of direct proof and must usually be inferred from all of the facts and circumstances disclosed by the evidence." ' " (*People v. Holt* (1997) 15 Cal.4th 619, 669 (*Holt*).)

Under the facts of this case, establishing that Myles acted with the intent to commit theft was a particularly challenging task for the prosecution. The modification of the CALCRIM No. 1800 instruction made this task easier. It defined theft in terms of acts Myles undisputedly committed after entering the home (use of utilities, consumption of property), and told the jury these acts are criminal to the extent they were "unauthorized," which they were in light of Jake's uncontradicted testimony that he never authorized the use or consumption. Thus to the extent the jury relied on the alternate definition of theft added by the modification, it was a

28

foregone conclusion it would find Myles committed theft. Having made this finding, it was but a small step for the jury to infer that Myles intended to commit theft upon entering the home, and that he harbored the same intent at the time of the attempted entry. In this way, the erroneous modification lightened the prosecution's burden of proof on the charges of burglary and attempted burglary.

The People do not argue, and we do not find, that the other instructions the jury received cured the error. The trial court's obligation to correctly define burglary extends to defining the target offense that the defendant allegedly intended to commit at the time of entry. (*Hughes*, *supra*, 27 Cal.4th at p. 349.) Although the jury was instructed on the defense of mistake of fact pursuant to CALCRIM No. 3406, this instruction did not define theft. As our high court has explained, a jury must receive correct instructions on the substantive mens rea requirement for burglary as well as on any mistake of fact defense. (Cf. *Hendrix*, *supra*, 13 Cal.5th at p. 941 [instructional error occurs where the substantive mens rea instruction for burglary and the mistake of fact instruction relating to burglary are not "aligned"].)

## III.

### *The Error Was Prejudicial*

The People contend that to the extent the trial court committed instructional error, we should assess the prejudicial effect of the error under the *Watson* standard for reviewing errors of state law. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [reversal required only if it is reasonably probable a result more favorable to the appealing party would have been reached absent the error].) Citing *Hendrix*, *supra*, 13 Cal.5th 933, they argue that review under the more stringent *Chapman* standard for reviewing errors of federal constitutional dimension (*Chapman v. California* (1967) 386 U.S.

29

18 (*Chapman*)) is not required because the error was "not tantamount to misinstruction on an element of the offense of burglary," and did not "misdescribe[ ] an element" or "relieve the prosecution of its burden to prove any element of the crime."

We disagree that the trial court's instructional error was one of state law only. "Among the constitutional errors subject to *Chapman* review is misinstruction of the jury on one or more elements of the offense. [Citations.] This is because the federal Constitution requires 'criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' [Citations.] A jury misinstruction that relieves the prosecution of its burden to prove an element of the crime—by either misdescribing the element or omitting it entirely—violates this requirement." (*Hendrix*, *supra*, 13 Cal.5th at p. 942.)

In *Hendrix*, the prosecution claimed the defendant entered the victim's home intending to commit theft. The defendant claimed he entered the house under the mistaken belief it was his cousin's house. (*Hendrix*, *supra*, 13 Cal.5th at pp. 936–937.) The trial court gave the jury a mistake of fact instruction that erroneously told the jury the defendant's mistaken belief was a defense to burglary only if it was reasonable. (*Id.* at p. 938.) This was error, because an unreasonable but honest mistaken belief can negate specific intent. (*Id.* at p. 939.) The issue before our Supreme Court in *Hendrix* was whether the error in the mistake of fact instruction was "tantamount to a misinstruction on the mental, or mens rea, element of the offense, requiring the application of *Chapman* review," or whether it constituted a mere state law error in a mistake or voluntary intoxication defense, a type of instructional error generally reviewed for prejudice under *Watson*. (*Hendrix*, at pp. 942–943.) The Court ultimately found it unnecessary to decide

30

whether *Chapman* or *Watson* applied because it found the error prejudicial even under the less stringent *Watson* standard. (*Hendrix*, at pp. 944–949.)

Here, unlike *Hendrix*, the instructional error *was* "tantamount to a misinstruction on the mental, or mens rea, element of the offense[.]" (*Hendrix*, *supra*, 13 Cal.4th at pp. 942–943.) The attempted burglary instruction (CALCRIM No. 460) told the jury to refer to the burglary instruction to decide whether Myles attempted to enter the house with the required intent to commit burglary. The burglary instruction (CALCRIM No. 1700), in turn, told the jury to refer to the theft instruction to decide whether he entered the house with the required intent to commit theft. The theft instruction (CALCRIM No. 1800) was thus incorporated by reference directly in the burglary instruction and indirectly in the attempted burglary instruction. It was essential to the jury's understanding of the mental state required to commit each of the charged offenses.

The unmodified part of the theft instruction was the only offense instruction that made it explicitly clear Myles's culpability for the charged offenses hinged on the prosecution's ability to prove beyond a reasonable doubt that he intended to deprive someone else of their property when he entered and attempted to enter the Oceanside home. The modified part of the theft instruction left out this requirement, allowing the jury to convict Myles of burglary and attempted burglary even in the absence of proof beyond a reasonable doubt that his mental state at the time of the entry and attempted entry matched the mental state required to form the intent to commit theft. Thus, unlike *Hendrix*, the instructional error in this case was an error that impinged on Myles's federal constitutional rights. (Cf. *Hendrix*, *supra*, 13 Cal.5th at pp. 942–943; see *Hughes*, *supra*, 27 Cal.4th at p. 353 [applying *Chapman* to assess prejudice of failure to instruct on elements of

31

target offense of burglary]; *People v. Aledamat* (2019) 8 Cal.5th 1, 3–5, 9 [*Chapman* standard of review applies when a trial court instructs a jury with two theories of guilt, one of which is incorrect].)

Even so, much like the *Hendrix* court, we would find the instructional error prejudicial even under *Watson*. As we have by now made amply clear, the only disputed issue at trial was whether Myles intended to commit theft when he entered and attempted to enter Jake's home. In her closing argument to the jury, defense counsel went so far as to concede all other elements of the burglary and attempted burglary charges in counts 1 and 2. As in *Hendrix*, "[t]he potential effect of the error was considerable in this case[.]" (*Hendrix, supra*, 13 Cal.5th at p. 945.)

The evidence that Myles intended to commit theft at the time of the May 2020 entry and January 2021 attempted entry was not strong. For its part, the prosecution argued breaking the kitchen window to enter the home, and unplugging the security system touch screen, were evidence Myles was intending to commit theft. However, these actions were equally consistent with an intent to trespass. The only other acts the prosecution could point to as evidence of Myles's intent to commit theft were his incidental use of items around the house. However, this was weak evidence that Myles had the specific intent to steal at the time of entry, and it was entirely consistent with Myles's defense that he acted under the delusional belief he was the home's owner.

Myles, on the other hand, testified his only intent on each occasion was to get out of the cold, a goal that could be accomplished merely by going indoors, without any use of the home's energy. Moreover, the defense presented ample evidence that in May 2020 and January 2021 Myles's understanding of reality was affected by delusions that caused him to believe

the home and its contents were his. Under this delusional view, even assuming that on each occasion Myles was intending to use the home's utilities or consume any food or beverages he might find in the house, this would not amount to an intent to permanently deprive the owner of property but rather would constitute an intent to have the owner—Myles—enjoy his own property.

The prosecution's statements in closing arguments magnified the instructional error. The prosecutor argued, "The best evidence that somebody has an intent to steal, [is] the fact that they actually steal things." Then in rebuttal argument, the prosecution specifically directed the jury to the erroneous instruction as the basis for an argument that to "consume" was synonymous with to "steal," and told the jury that "using the items in the home . . . is theft."

Nor is it possible to determine on this record that the jury made the required findings despite the error. The mistake of fact instruction told the jury "[i]f you find" Myles believed Jake's house was Myles's house, then Myles did not "have the specific intent or mental state required for Burglary and Attempted Burglary." This signaled an affirmative finding of Myles's mistaken belief about property ownership was necessary to negate the mental state required for the charged offenses, thereby placing the burden of proof on the defense to prove his mental state was *not* culpable.

The only instruction that made clear the prosecution bore the burden to prove Myles's mental state with respect to property ownership *was* culpable was the unmodified portion of the theft instruction. The modification simplified theft so as to make Myles's knowledge of property ownership irrelevant to his culpability. Under the instructions given to the jury, it was possible for the jury to convict Myles by simultaneously *not* making the

33

affirmative finding required by the mistake in fact instruction, while also *not* considering whether the prosecution met its burden to prove beyond a reasonable doubt that Myles acted with the intent to deprive the house's owner of property.  Thus, it is not possible to determine from the jury's verdict that it found the prosecution proved all elements of burglary and attempted burglary beyond a reasonable doubt despite the erroneous theft instruction.

On this record, there is at least " ' " 'a reasonable chance, more than an abstract possibility' " ' " Myles would have obtained a more favorable outcome on the burglary and attempted burglary charges had the jury not been given an instruction that equated theft with the mere unauthorized use of utilities or consumption of property in a home.  (*Hendrix*, *supra*, 13 Cal.5th at p. 944; see *id.* at pp. 946–950.)  As our high court has explained, "a hung jury, as opposed to an acquittal, is a 'more favorable' (*Watson*, *supra*, 46 Cal.2d at p. 836) outcome for purposes of harmless error review under *Watson*." (*Hendrix,* at p. 947, fn. 6.)  Assuming the jury believed Myles entered and attempted to enter the house planning to use its utilities or consume any food he might find inside, at least one juror could easily have remained unconvinced that in intending to use or consume these items, Myles also intended to permanently deprive the owner of them.  (See *id.* at p. 947.)

As a result, we will reverse Myles's convictions of the charges in counts 1 and 2 of the amended information.  As we discuss next, our reversal of the convictions is not predicated on a finding the trial evidence was insufficient to sustain the jury's verdict.  Therefore, on remand, the prosecution will not be barred from retrying Myles on these charges.  (See *Burks v. United States* (1978) 437 U.S. 1, 14 [double jeopardy clause does not preclude retrial "to rectify *trial error*"]; *People v. Hernandez* (2003) 30 Cal.4th 1, 10 [listing

34

prejudicial instructional error as a trial error].)  We express no opinion on whether it should do so.

IV.

*There Is Sufficient Evidence in the Record from Which a Rational Trier of Fact Could Find the Specific Intent Element of the Charged Offenses*

Myles contends the trial evidence was insufficient to support the burglary or attempted burglary convictions.  He argues the evidence he acted with the requisite specific intent to commit theft was lacking, because he presented evidence he suffered from delusions that caused him to believe he owned Jake's home, and because there was "[n]o [e]vidence" he intended to consume or steal anything at the time of entry.  We disagree.

In determining whether substantial evidence supports a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses."  (*People v. Little* (2004) 115 Cal.App.4th 766, 771 (*Little*), citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)  "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87 (*Manibusan*).)

Having considered Myles's arguments and having reviewed the trial record, we conclude that although the trial evidence of specific intent was weak, it was nevertheless sufficient to satisfy the deferential substantial evidence standard of review.  As we have noted, whether a burglary defendant entered the premises with the intent to commit theft "[c]ommonly

35

. . . must be inferred from the circumstances of the charged offense or offenses." (*Holt*, *supra*, 15 Cal.4th at p. 669.) "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom" (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064), and " 'circumstantial evidence is as sufficient as direct evidence to support a conviction' " (*Manibusan*, *supra*, 58 Cal.4th at p. 87).

As discussed, the prosecution presented evidence Myles broke a kitchen window to enter the home, unplugged the security system touch screen, and drank a beverage and ate food inside the home. The jury reasonably could infer from the manner of entry and unplugging of the security system touch screen that Myles was aware he was committing an unauthorized entry; the subsequent takings, however minor, supported an inference he intended to commit theft at the time of entry. Although some of this evidence was also consistent with an innocent state of mind, for purposes of substantial evidence review, we are not permitted to draw inferences contrary to the verdict. (*Little*, *supra*, 115 Cal.App.4th at p. 771.) Rather, " ' " [w]hen the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal.' " ' " (*Holt*, *supra*, 15 Cal.4th at p. 670.)

And while Myles offered his own testimony as well as the testimony of Dr. Murphy in an effort to persuade the jury he did not act with the requisite mental state, on substantial evidence review, we do not reweigh credibility or resolve conflicts in the evidence. (*Little*, *supra*, 115 Cal.App.4th at p. 771.) Rather, " ' "we look for substantial evidence." ' " (*Manibusan*, *supra*, 58 Cal.4th at p. 87.) Having found such evidence in the trial record, we are compelled to reject Myles's sufficiency of the evidence challenge.

DISPOSITION

Myles's convictions of the charges in counts 1 and 2 of the amended information are reversed, and the matter is remanded for proceedings consistent with this opinion.

DO, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.